895 F.2d 994
 Joseph F. COLLINSON, Plaintiff-Appellee,
v.
John M. GOTT, Sr., individually and as President of the
Board of County Commissioners of Calvert County;
Board of County Commissioners of Calvert
County, Defendants-Appellants,
Edward Bowen, individually and as a Lieutenant in the
Sheriff's Department of Calvert County, Maryland; Patrick
Nutter, individually and as a Sergeant in the Sheriff's
Department of Calvert County, Maryland, Defendants-Appellees.
Joseph F. COLLINSON, Plaintiff-Appellant,
v.
John M. GOTT, Sr., individually and as President of the
Board of County Commissioners of Calvert County; Board of
County Commissioners of Calvert County; Edward Bowen,
individually and as a Lieutenant in the Sheriff's Department
of Calvert County, Maryland; Patrick Nutter, individually
and as a Sergeant in the Sheriff's Department of Calvert
County, Maryland, Defendants-Appellees.
 Nos. 88-3859, 88-3881.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 6, 1988.
Decided Feb. 13, 1990.
 
 Daniel Karp (Allen, Thieblot & Alexander, Baltimore, on brief), Paul T. Cuzmanes (Wilson, Elser, Moskowitz, Edelman and Dicker, Washington, D.C., on brief), for appellants.
 Glen Marcus Fallin, Baltimore, Md., for appellee.
 Before PHILLIPS and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 This case presents novel and important constitutional issues growing out of a citizen's claim that his first amendment rights were violated when the president of a board of county commissioners ruled him out of order while he was addressing a called public meeting and then had him evicted.
 
 
 2
 In Joseph Collinson's action under 42 U.S.C. Sec. 1983 against John M. Gott, President of the Board of Commissioners, the Calvert County, Maryland, Board of Commissioners, and Edward Bowen and Patrick Nutter, police officers who carried out Gott's eviction order, the district court denied Collinson's motion for summary judgment; denied the motions of Gott and the Board, respectively, for summary judgment; denied Gott's motion to dismiss Collinson's claim for punitive damages; and granted summary judgment by reason of qualified immunity to the police officers, Bowen and Nutter.
 
 
 3
 * The case is before this court on the appeals of Gott and the Board, and the cross-appeal of Collinson from those parts of the judgment severally unfavorable to them.
 
 
 4
 This case arose out of a public meeting called to discuss a proposed reorganization of the county government of Calvert County, Maryland. Various proposals for reorganization became an important issue in the fall 1986 Calvert County Board of Commissioners election campaign. Shortly after the election, the Board began to consider specific plans for reorganization. In mid-winter, the Board announced that it would hold a public hearing on the reorganization issue on March 10, 1987, at 11:15 AM.
 
 
 5
 Collinson, who professed a "long-standing interest in the affairs of the government of ... Calvert County," attended the meeting for the purpose of expressing his views on the proposed reorganization plans. Before the meeting began, Gott, the President of the Board, announced that members of the public wishing to address the Board must sign up on a master list, and that each speaker would have two minutes to make his remarks. Gott claims that he also warned that remarks should be confined to the reorganization question, and that speakers would be required to "avoid discussion of personalities."* Collinson signed the list and was scheduled to speak second. He now claims that he intended to address three separate issues: (1) the impropriety of an unnamed commissioner's earlier expression of a firm position on the reorganization, which Collinson thought suggested a certain futility to conducting a public hearing; (2) the desirability of hiring an expert to study the reorganization question; and (3) the desirability of organizing the new county government such that the division of inspections and permits would become a part of the engineering department.
 
 
 6
 It is undisputed that Gott was extremely apprehensive about the public hearing, in part at least because sometime before the hearing he received an anonymous telephone call in which he was told that "if [he] knew what was good for him, and if he wanted to stay involved in local politics, he should change his position on abolishing the county's department of human resources"--an element of the proposed reorganization plan. Gott understood the call to be a threat. With the Board's consent, Gott asked the county sheriff's department to provide several deputies at the hearing to act as a stabilizing element and to provide security. Between 125 and 150 persons attended the meeting, and Gott was fearful that, in light of passions provoked in the local community over the reorganization issue, the hearing might become disorderly. While the parties dispute the matter, Gott claims, without any direct refutation, that he was particularly concerned about possible disruptions by the supporters of a Mr. Trammer, then the county director of human resources, whose position would be eliminated under the reorganization plan.
 
 
 7
 As scheduled, Collinson was the second member of the public to speak at the hearing. The following exchange between Collinson and Gott then occurred:
 
 
 8
 GOTT [to previous speaker]: Thank you. I felt the same way the night the League--next is Joe Collinson. Is that right, Joe?
 
 
 9
 COLLINSON: That's right honorable Chairman, honorable members of the Board of County Commissioners. It is a pleasure to speak here and what I would like to say most is that I was sorry to read in the paper about one Commissioner already making up his mind in his answers to Mr. Roberts. That was in very poor taste, and really, I hope he decides--
 
 
 10
 GOTT: Mr. Collinson, I'm going to call you out of order. This public hearing is for the reorganization of Calvert County and not to respond--
 
 
 11
 COLLINSON: Well this was the reorganization that he was quoted on and said that he was in favor of before it even came out.
 
 
 12
 GOTT: That has nothing to do with the reorganization. Mr. Collinson, I'm calling you out of order.
 
 
 13
 COLLINSON: Now, don't count my time now.
 
 
 14
 GOTT: You're out of order Mr. Collinson.
 
 
 15
 COLLINSON: Alright, on Inspections and Permits, you've got--
 
 
 16
 GOTT: I'll ask the Deputy to remove Mr. Collinson, please.
 
 
 17
 COLLINSON: --that under Planning and Zoning, and that is like the fox watching the chicken house. Inspections and Permits should be a department in itself. You take money in, and it shouldn't be under Planning and Zoning. Gentlemen, this is a nice public hearing.
 
 
 18
 GOTT: The next speaker will be Mr. John O'Meara.
 
 
 19
 COLLINSON: Thank you, I don't have more to say.
 
 
 20
 During this exchange sheriff's deputy Patrick Nutter, following Gott's direction, approached Collinson, lightly touched him on the arm and told him that he would have to leave. Collinson complied and left the hearing room, escorted by Nutter. Collinson was not arrested, and the parties agree that he acted peacefully. The whole episode lasted less than a minute. The meeting continued. Twenty-one more speakers, expressing various viewpoints, some in line with those Collinson claims he would have expressed, were heard. Gott ruled several more speakers out of order on various points, but evicted no others. The meeting lasted about an hour in all.
 
 
 21
 Collinson later brought this Sec. 1983 action against Gott, the Board, Nutter, and Edward Bowen, another sheriff's deputy present at the hearing, seeking damages for an alleged violation of his first amendment rights in connection with the March 10 incident. After fairly extensive discovery, the parties filed cross-motions for summary judgment; the district court ruled as previously indicated; and these appeals and cross-appeals followed.
 
 II
 
 22
 Because of divisions within the panel, it has not been possible for a majority of the panel to join in a single opinion on all issues. Separate opinions reflecting the points of division follow this per curiam opinion.
 
 
 23
 In summary, on the issue of Gott's entitlement to summary judgment by reason of official immunity to suit, Judge Phillips and Judge Wilkinson agree that he is so entitled, but Judge Phillips would so hold on the basis of qualified immunity, Judge Wilkinson on the basis of absolute immunity, while Judge Butzner, dissenting, would hold Gott not entitled to immunity by summary judgment. On the issue of the entitlement of the Board and officers Bowen and Nutter, respectively, to summary judgment, the panel is unanimously agreed that each is so entitled: the officers, on the basis of qualified immunity; the Board, on the merits. On the issue of Collinson's claim for punitive damages, Judge Phillips and Judge Wilkinson agree that because all defendants are, in their view, entitled to summary judgments, the issue of Collinson's specific entitlement to punitive damages has become moot and should be dismissed, while Judge Butzner, dissenting, would hold that the district court properly refused to dismiss the claim as against Gott.
 
 
 24
 Accordingly, the judgment of the court is as follows. The denial of Gott's motion for summary judgment by reason of immunity is reversed. The denial of the Board's motion for summary judgment is reversed. The grants of summary judgment by reason of qualified immunity to officers Bowen and Nutter, respectively, are affirmed. The denial of Gott's motion to dismiss Collinson's claim for punitive damages is vacated as moot and the claim is dismissed.
 
 
 25
 IT IS SO ORDERED.
 
 
 26
 PHILLIPS, Circuit Judge, concurring in the judgment:
 
 
 27
 * I first consider Gott's claim of qualified immunity.[1]A
 
 
 28
 It is important at the outset to remember that the question of qualified immunity is not the question whether a constitutional right has been violated. Here, therefore, Gott's entitlement to summary judgment on the basis of qualified immunity does not turn on whether he would be entitled to judgment as a matter of law that he did not violate Collinson's first amendment rights. Because immunity principles are designed to shield officials not only from ultimate liability, but--so far as possible--from the burdens of litigation itself, the immunity shield is necessarily more protective than is the defense on the merits. Accordingly, the now-familiar test of qualified immunity is whether government officials such as Gott in performing discretionary functions have engaged in conduct that violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Obviously, under that test, an official may be entitled to immunity from suit even where he has violated a plaintiff's rights--if they were not then "clearly established" or if a "reasonable person" in the official's position could have failed to appreciate that his conduct would violate them. See Mitchell v. Forsyth, 472 U.S. 511, 535, 105 S.Ct. 2806, 2820, 86 L.Ed.2d 411 (1985) ("decisive fact is not that [defendant's] position turned out to be incorrect, but that the question was open at the time he acted").
 
 
 29
 In analyzing a claim of qualified immunity it is therefore necessary first to identify the specific constitutional right allegedly violated, then to inquire whether at the time of the alleged violation it was clearly established, then further to inquire whether a reasonable person in the official's position would have known that his conduct would violate that right. The first two of these inquiries present pure questions of law for the courts, see Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 3038-40, 97 L.Ed.2d 523 (1987); Mitchell, 472 U.S. at 535 n. 12, 105 S.Ct. at 2820 n. 12. The third, which involves application of Harlow 's objective test, may sometimes require factual determinations respecting a defendant's conduct and its circumstances, but the test's ultimate application is also a matter of law for the court. See Anderson, 107 S.Ct. at 3042 n. 6.
 
 
 30
 In the first step, determining whether the right allegedly violated was "clearly established," the proper focus for courts is not upon the right at its most general or abstract level, but upon its application to the particular conduct being challenged. Anderson, 107 S.Ct. at 3038-39; see also Tarantino v. Baker, 825 F.2d 772, 774-75 (4th Cir.1987). Furthermore, the assessment whether a "reasonable person" in the official's position would have known that his conduct would violate "clearly established" rights must be made on the basis of information actually possessed at the time by the official, Anderson, 107 S.Ct. at 3040, or then readily available to him, Sevigny v. Dicksey, 846 F.2d 953, 957 n. 5 (4th Cir.1988), and in light of the exigencies of time and circumstance in which the official took the action challenged. See Malley v. Briggs, 475 U.S. 335, 350, 106 S.Ct. 1092, 1100, 89 L.Ed.2d 271 (1986) (Powell, J., concurring in part and dissenting in part). The tolerance thus accorded by the objective test to "good faith" mistakes of judgment traceable to unsettled law, or faulty information, or contextual exigencies, is deliberately designed to give protection "to all but the plainly incompetent or those who knowingly violate the law," Malley, 475 U.S. at 341, 106 S.Ct. at 1096, in order to avoid undue inhibition of public officials in the discharge of their discretionary duties. Anderson, 107 S.Ct. at 3038.
 
 B
 
 31
 With these basic principles in mind, we can turn to the inquiry whether Gott was entitled to summary judgment on the basis of qualified immunity here.
 
 
 32
 At the most general level, the constitutional right at issue is of course the first and fourteenth amendment right to speak free of any state-imposed restrictions on the content of one's speech. See, e.g., Police Dept. v. Mosley, 408 U.S. 92, 95-96, 92 S.Ct. 2286, 2289-2290, 33 L.Ed.2d 212 (1972). But this general right is of course subject to the qualification that government officials may impose reasonable time, place, and manner restrictions upon speech in public forums, so long as they are content-neutral and are "narrowly tailored" to serve a significant governmental interest. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 295, 104 S.Ct. 3065, 3069, 3070, 82 L.Ed.2d 221 (1984); Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 647-48, 101 S.Ct. 2559, 2563-64, 69 L.Ed.2d 298 (1981). It is subject to the further qualification that even content-based restrictions may be imposed where there is "a clear and present danger that [the speech] will bring about the substantive evils that [government] has a right to prevent," Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919), though the evil justifying such a restriction must "rise[ ] far above public inconvenience, annoyance, or unrest." Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949). And finally, the general right may be subjected to greater restrictions in "limited" public forums specially created by the state than in such traditional "open" public forums as streets, parks, and general meeting halls. See City of Madison Joint School Dist. No. 8 v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 175 n. 8, 97 S.Ct. 421, 426 n. 8, 50 L.Ed.2d 376 (1976) (called public meetings); id. at 180, 97 S.Ct. at 429 (Stewart, J., concurring).
 
 
 33
 The general contours of the first amendment right here asserted, at the level of generality above outlined, were surely well-established at the time here in issue. And a reasonable person presiding in an official capacity over a public meeting of the type here in issue must surely be charged with awareness of the general contours of the right at this level of generality.
 
 
 34
 But when inquiry focuses upon the more specific issue of the constitutional right's application to ad hoc parliamentary rulings by local officials presiding over called public meetings, the matter becomes considerably less "settled." To start with, it would appear that no federal court up to that time had ever directly held that such an ad hoc parliamentary ruling could or had violated a speaker's first amendment speech rights.[2] That alone does not establish entitlement to qualified immunity here, but it surely bears heavily on whether the unlawfulness of the conduct challenged here--if it be unlawful--should have been apparent to a reasonable official in Gott's position. See Anderson, 107 S.Ct. at 3039.
 
 
 35
 To the extent that intimations of the right's application in this specific context may then have existed in more general judicial discussions and applications of first amendment principles, the intimations were amorphous and few in number. In general, such intimations as there were suggested considerable latitude for official action both in imposing general subject matter restrictions on scheduled public meeting discussions, see City of Madison, 429 U.S. at 175 n. 8, 97 S.Ct. at 426 n. 8 ("Plainly ... may confine ... meetings to specified subject matter...."), and in making ad hoc rulings to keep discussion within reasonable time and manner bounds once a scheduled meeting was underway, see Wright v. Anthony, 733 F.2d 575 (8th Cir.1984) (five minutes per speaker limit reasonable). But none, it is fair to say, suggested that there were no constitutional limits--that one's first amendment speech rights are effectively checked at the door of any meeting called by public officials to discuss matters of public concern, with the official presiding over such a meeting becoming the sole arbiter of those rights.
 
 
 36
 The plain legal implications of the most relevant decisions extant at the critical time here I would identify as follows.
 
 
 37
 1. Speech at public meetings called by government officials for discussion of matters of public concern is entitled to normal first amendment protections against general restrictions or ad hoc parliamentary rulings by presiding officials. City of Madison, 429 U.S. at 175-76, 97 S.Ct. at 426-27.
 
 
 38
 2. Because of government's substantial interest in having such meetings conducted with relative orderliness and fairness to all, officials presiding over such meetings must have discretion, under the "reasonable time, place and manner" constitutional principle, to set subject matter agendas, and to cut off speech which they reasonably perceive to be, or imminently to threaten, a disruption of the orderly and fair progress of the discussion, whether by virtue of its irrelevance, its duration, or its very tone and manner.[3] This obviously contemplates that in this setting the content of speech may properly be the conscious target of state action (where it is cut off for irrelevance or manner of delivery), or its collateral victim (when it is cut off for excessive duration). But this consequence assuredly lies within well-established constitutional principles, once it is accepted, as I think we must, that disruption of the orderly conduct of public meetings is indeed one of the "substantive evils that [government] has a right to prevent." Schenck, 249 U.S. at 52, 39 S.Ct. at 249.
 
 
 39
 3. As indicated, official discretion here is not limitless. The limits can be found in the well-established principle that the primary concern of the no-censorship-of-content requirement is with speaker viewpoint rather than with subject matter per se. See generally Stone, Restriction of Speech Because of its Content: The Peculiar Case of Subject-Matter Restrictions, 46 U.Chi.L.Rev. 81, 83, 108 (1978) (distinction noted). While the latter will yield fairly readily to time, place and manner restrictions, the former will but rarely, if ever, do so. Thus, while a ruling, "We will not listen to your views on capital punishment at this public hearing on rezoning," certainly must be constitutionally permissible, a ruling, "We will not listen to yours or any views favoring rezoning at this rezoning hearing," obviously would not be. See City of Madison, 429 U.S. at 175-76 & n. 8, 97 S.Ct. at 426-27 & n. 8 (contrasting impermissibility of viewpoint restrictions with permissibility of general subject matter restrictions in conduct of public meetings).
 
 
 40
 I think, and would hold, that the general contours of the first amendment right in this specific context, as just described, must be considered to have been well-established at the critical time, for purposes of the qualified immunity inquiry.
 
 
 41
 I would further hold as a matter of law that a reasonably competent official in Gott's position would have known that while he could, within these principles, rule Collinson out of order and evict him if he had reason to believe that necessary to avoid disruption of the orderly conduct of the meeting, he could not constitutionally do so if he had no reasonable basis for fearing disruption, or if his actual purpose was to prevent expression of Collinson's viewpoint on the reorganization issue.C
 
 
 42
 This then leads to the question whether, within these principles, Gott was entitled, on the record we review, to qualified immunity, hence to summary judgment. And here we encounter difficult conceptual problems in applying the objective test of qualified immunity to the particular type of constitutional claim here in issue. The problems arise from the fact that the first amendment claim here turns both on Gott's subjective purpose and on the objective reasonableness of his perceptions. The difficulty this poses for application of Harlow 's wholly objective test can be illustrated by posing that test in terms fact-specific to this case: "Would a reasonable person in Gott's position, that is, one acting on Gott's information and knowledge and motivated by Gott's purpose, have known that to rule Collinson out of order would violate the well-established first amendment principles above identified?" The difficulty is that to make that "objective" inquiry here requires both determining Gott's subjective purpose--whether to suppress a viewpoint or merely to avoid disruption--and, if the latter, determining whether a reasonable person in Gott's position, acting on the information available to Gott, reasonably could have feared disruption by Collinson's speech, even if such a fear was objectively unfounded. That is to say, it seemingly requires a "double-counting" of the "reasonableness" of Gott's perceptions of the justification for his ruling, and it surely introduces a subjective component into Harlow 's avowedly "objective" test here.
 
 
 43
 Notwithstanding the difficulties, the test must of course be applied. The proper course obviously is to keep in mind the policies that underlie qualified immunity doctrine and not become unduly hung up on metaphysical difficulties.
 
 
 44
 We have some guidance here. On the less serious problem of "double-counting" the objective reasonableness of Gott's conduct, the Supreme Court recently has simply rejected the argument that when a constitutional violation turns on the "reasonableness" of official conduct, it should never be possible to grant immunity on the basis that a reasonable person might have thought that "unreasonable" conduct was "reasonable." See Anderson, 107 S.Ct. at 3041 ("surface appeal of argument" rejected; Harlow test contemplates grant of immunity on basis that reasonable person in police officer's position could have believed an unreasonable search to be reasonable). As the Anderson Court pointed out, because most constitutional rights turn on the reasonableness of official conduct in making accommodations between governmental needs and individual freedoms, such double-counting of reasonableness is simply implicit in the Harlow objective test. Id. Here, therefore, that test does indeed contemplate that though Gott may have been mistaken in thinking that his ruling was justified as a "reasonable" time, place, and manner restriction, his perception may nevertheless have been an objectively reasonable one under the circumstances.
 
 
 45
 The more serious problem is that arising from the subjective component of the constitutional right in issue--Gott's purpose in ruling Collinson out of order. It is more serious because of the difficulty it creates for resolving a qualified immunity defense without the need for trial. Vindication of immunity policies depends heavily upon the ability to dispose of insubstantial claims by resolving immunity questions at the earliest possible stages of a litigation, preferably on pleading or summary judgment motions. See Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815. Questions of subjective states of mind are of course notoriously ill-adapted to summary resolution because of the ease with which they can be held at issue by conclusory allegations and conjectures in pleadings and discovery materials. Harlow 's wholly "objective" test was adopted in large part to avoid this impediment to early resolution, by making irrelevant to the immunity inquiry any question of an official's "bad faith" or his purely subjective perceptions about a plaintiff's rights. See Harlow, 457 U.S. at 815-19, 102 S.Ct. at 2736-39. As several courts of appeals have since recognized, however, the resulting purely "objective" test cannot in the end avoid the necessity to inquire into official motive or intent or purpose when such states of mind are essential elements of the constitutional right allegedly violated. See, e.g., Pueblo Neighborhood Health Centers, Inc. v. Losavio, 847 F.2d 642, 647-48 (10th Cir.1988); Musso v. Hourigan, 836 F.2d at 743; Gutierrez v. Municipal Court, 838 F.2d 1031, 1050 n. 25 (9th Cir.1988); Martin v. D.C. Metropolitan Police Dept., 812 F.2d 1425, 1432 (D.C.Cir.), holding vacated, 817 F.2d 144 (D.C.Cir.), holding reinstated sub nom. Bartlett ex rel. Neuman v. Bowen, 824 F.2d 1240 (D.C.Cir.1987).
 
 
 46
 As a result, as several of these courts also have recognized, there is a risk that in such cases the impediment to summary resolution that Harlow deliberately sought to remove could be reimposed. See Pueblo, 847 F.2d at 648; Martin, 812 F.2d at 1433. To minimize that risk, these courts have adopted a procedural approach designed to insure that meritorious immunity defenses can yet be established by summary judgment in such cases. Building on the Supreme Court's recent encouragement to proper usages of summary judgment in Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Tenth Circuit, for example, has held that
 
 
 47
 [w]here the defendant's subjective intent is an element of the plaintiff's claim and the defendant has moved for summary judgment based on a showing of the objective reasonableness of his actions, the plaintiff may avoid summary judgment only by pointing to specific evidence that the officials' actions were improperly motivated.
 
 
 48
 Pueblo, 847 F.2d at 649; see also Martin, 812 F.2d at 1434.
 
 
 49
 I agree with this approach. While the Pueblo court thought it might impose a higher than ordinary standard on plaintiffs' opposing summary judgment motions, see Pueblo, 847 F.2d at 649, I do not believe this is necessarily so. Essentially, it simply provides that plaintiffs cannot rely on merely conclusory assertions of unconstitutional motive in this context. In this, it seems to me to be well within established procedures under Fed.R.Civ.P. 56, particularly in the aftermath of Celotex and Liberty Lobby. If it does represent a heightened standard, however, I agree with the Pueblo court that it is justified as a necessary means for vindicating immunity principles. Certainly it appears to me to strike a fair and appropriate balance between the imperatives of immunity doctrine and the need to provide realistic avenues for the vindication of constitutional guarantees. See Martin, 812 F.2d at 1433. I would adopt it as the rule in this circuit and apply it here in the following slightly modified form:
 
 
 50
 When a defendant's motive or intent is an element of a constitutional claim, a defendant's motion for summary judgment based upon a plausible showing of the objective reasonableness of his actions, including a proper motive or intent, may not be defeated by merely conclusory assertions of improper motive or intent, but only by pointing to specific evidence of improper motive or intent.
 
 
 51
 Applying that rule here, I would find Gott entitled to summary judgment by reason of qualified immunity.
 
 
 52
 On the issue of his motive for ruling Collinson out of order, Gott made a plausible showing that his motive was not to suppress a particular viewpoint on the reorganization issue, but to avoid an imminently threatened disruption of the orderly conduct of the meeting. That is the repeated, consistently maintained gist of his own affidavit and deposition testimony. See J.A. 55-62 (deposition); 69 (affidavit). His assertions of motive are not made suspect or implausible by any internal inconsistencies or extrinsic circumstances. Their plausibility is indeed strongly supported by two factors: the technical justification for the ruling following Collinson's opening comment, and, more critically, Gott's reaction to the expression by others at the meeting of viewpoints comparable to Collinson's. As indicated, after Collinson was ruled out of order, twenty-one more speakers were heard. It is undisputed that some expressed the identical views on the relevant subject matter that Collinson claims he would have expressed. See id. at 75 (minutes of meeting). It is also undisputed that none was prevented or restricted in any way from expressing those viewpoints, although Gott did rule some speakers out of order for reasons manifestly unrelated to their viewpoints. See id. at 47-52 (Gott deposition). Gott's specific explanation for acting so swiftly on Collinson's opening irrelevancy--that he intended to get the meeting under control immediately, id. at 57-61--is perfectly consistent with a motive unrelated to viewpoint, and is plausible in total context of the record.
 
 
 53
 In response to these consistent assertions of motive by Gott, Collinson can point to no specific evidence suggesting a motive to suppress his viewpoint. There is of course the evidence that he was effectively prevented from making his intended comments on the merits, but this of course is simply the consequence of any out-of-order ruling. Where, as here, such a ruling is facially justified, the fact that it necessarily then cuts off all further speech is specific evidence of nothing more than that obvious fact.
 
 
 54
 It may be objected that more specific evidence of unconstitutional motive will seldom if ever be available. That is of course true, but no more here than in any context requiring proof of a state of mind. Here, as in any such context, if there is factual merit to a non-movant's assertion, circumstantial evidence of the reality will almost invariably be available to hold existence of the asserted state of mind in genuine issue. Here there is none. I would therefore hold that on the summary judgment record we review there is no genuine dispute that Gott's motive was as he deposed it to be, that is, to insure orderly conduct of the meeting, and not to suppress Collinson's viewpoint on the announced subject matter.
 
 
 55
 That leads to the ultimate question whether a reasonable person in Gott's position, i.e., one motivated only to insure orderly conduct of the meeting, reasonably could have believed that ruling Collinson out of order and having him evicted was justified as a reasonable time, place, and manner restriction, hence not a violation of his constitutional rights. The answer to this is plainly "yes."
 
 
 56
 As earlier indicated, once it is accepted that Gott's purpose was to preserve order rather than to suppress viewpoint, the constitutionality of his conduct would turn entirely upon the reasonableness of his perception that a threat to order existed and of his choice of means to avoid the threat, i.e., upon whether his ruling was a reasonable time, place, and manner restriction under the circumstances. It is important therefore to realize that even were we assessing Collinson's constitutional claim on the merits, we would be required to accord considerable deference to Gott's perception of need and means because the content of the specific constitutional right at issue here "rests upon an assessment of what accommodation between governmental need and individual freedom is reasonable." Anderson, 107 S.Ct. at 3041. Thus, as the Supreme Court has recently pointed out, in assessing whether a challenged time, place, and manner restriction on speech is "narrowly tailored to serve a significant governmental interest," the constitutional test is not whether the means chosen was the least-restrictive available, but simply whether it "promotes a substantial government interest that would be achieved less effectively absent the regulation." Ward v. Rock Against Racism, --- U.S. ----, 109 S.Ct. 2746, 2756-58, 105 L.Ed.2d 661 (1989) (quoting United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985)). And the answer to that question " 'does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests' or the degree to which those interests should be promoted." Id.
 
 
 57
 Here, of course, our concern is not with whether, applying that already deferential constitutional test, Gott's conduct did violate Collinson's asserted right; it is only with whether, applying the still more deferential qualified immunity test, a reasonable person in Gott's position could have believed that it did not. Anderson, 107 S.Ct. 3038-39. Or, somewhat more starkly, whether "[presiding] officers of reasonable competence could disagree on the issue," in which case immunity should apply. See Malley, 475 U.S. at 341, 106 S.Ct. at 1096.
 
 
 58
 From the vantage point of the immunity inquiry, with its great deference to decisionmaker perceptions of need and means for restricting speech, it is clear to me that Gott is entitled to immunity.
 
 
 59
 It is hard to imagine circumstances in which the tolerance commanded by immunity doctrine for possible mistakes of judgment by public officials is more appropriate and necessary than those confronted by officials presiding over potentially explosive public hearings. Typically untrained and inexperienced in the difficult business of presiding and applying rules of order in fast-moving situations of tense political controversy, such officials are particularly fit subjects for the protections afforded by qualified immunity doctrine. Someone, after all, has to perform these necessary functions. The policies that underlie immunity doctrine will not be served by holding such persons to too exacting standards of calm and prescience in avoiding unintended violations of their fellow citizens' speech rights in this context. When the undisputed facts of this meeting's tense context and the specific exigencies of the moment are taken into account, it is obvious that at the very least persons of reasonable competence in Gott's position could have disagreed over whether the ability to conduct an orderly meeting was sufficiently threatened by Collinson's opening remarks to justify cutting him off immediately.
 
 
 60
 It may well be that Gott's perception both of basic need and of appropriate means was flawed. It may well be that Gott's chosen means were more draconian than justified by the actual exigencies. It is thus possible that Collinson's constitutional right was violated. But that, to repeat in conclusion, is not the question, and on the question that is before us, I would find Gott entitled to immunity, hence to summary judgment, and would reverse the district court's denial of Gott's motion.
 
 II
 
 61
 The next issue is whether the Calvert County Board of Commissioners was entitled to summary judgment. For reasons that follow, it was so entitled.
 
 
 62
 The reason is simple. Municipal liability could be imposed here, assuming Gott's conduct was unconstitutional, only under the stringent test of Monell v. Dept. of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978):
 
 
 63
 [A] local government may not be sued under Sec. 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Sec. 1983.
 
 
 64
 And the mere right of a governing body to control the acts of an official without any control having been exercised is not enough. Id. at 694 & n. 58, 98 S.Ct. at 2037 & n. 58; see also City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).
 
 
 65
 There is no evidence on this summary judgment record that the Board embraced any policy of silencing citizens at public hearings, or that it directly or by knowing inaction condoned Gott's conduct in this case. Nor can Gott's isolated act be considered an exercise of policymaking power by one empowered to "make policy" for the county in the matter at issue. Cf. Pembauer v. City of Cincinnati, 475 U.S. 469, 481-83 & nn. 9, 12, 106 S.Ct. 1292, 1299-300 & nn. 9, 12, 89 L.Ed.2d 452 (1986). As a matter of law, therefore, see Praprotnik, 108 S.Ct. at 924, the Board could not be liable to Collinson as a result of Gott's conduct. The district court erred in denying the Board's motion for summary judgment.
 
 III
 
 66
 The district court properly granted the motions of officers Nutter and Bowen for summary judgment on the basis of qualified immunity. Their conduct was taken courteously and in obedience to a presumably valid order of an official presiding over a public hearing which they had been directed to attend to enforce such orders as he might give them. Reasonable officers in their positions would have no basis for believing that under the circumstances their conduct would violate Collinson's constitutional rights. See Anderson, 107 S.Ct. at 3038.
 
 IV
 
 67
 Because neither Gott, nor officers Nutter and Bowen, can be held liable to Collinson, the question of Collinson's specific entitlement to punitive damages against these defendants is now moot. Accordingly, the district court's order denying the motion to dismiss those claims should be reversed.
 
 
 68
 WILKINSON, Circuit Judge, concurring in the judgment:
 
 
 69
 My Brothers would hold that an action under 42 U.S.C. Sec. 1983 will lie, subject only to a qualified immunity from suit, against a presiding officer at a public meeting who rules a speaker out of order. Judge Phillips would grant summary judgment in favor of the presiding officer by reason of qualified immunity; Judge Butzner would deny summary judgment on qualified immunity grounds. Both agree, however, that qualified immunity is the proper standard.
 
 
 70
 My Brothers fail to contemplate the grave harm to local government and the great potential damage to public debate that will follow from this holding. Rather than exposing presiding officers at public meetings to the litigious ordeal that inheres in a determination of the appropriateness of qualified immunity, not to mention a possible trial on the merits, I would hold Gott entitled to absolute immunity from suit for this single discretionary act.[1] My disagreement with my Brothers concerning the type of immunity a presiding officer should be afforded is far from academic. "To officials at risk of being sued, the difference between absolute and qualified immunity is crucial.... [T]his is not simply a matter of the probability of an ultimately favorable verdict; it amounts to the difference between being able to obtain a dismissal at the outset of the case and having to go to trial with a substantial defense." P. Shuck, Suing Government 89 (1983).
 
 
 71
 The first part of this opinion explains the serious consequences that follow from my Brothers' decision to apply qualified immunity here. Then, I show why absolute immunity from suit under Sec. 1983 must be afforded to one in Gott's position.[2]
 
 I.
 
 72
 Every presiding official in a public meeting must, at some time, make a spontaneous judgment as to whether a speaker is abusing the forum. Section 1983 was not intended to make actionable isolated incidents in which politicians show poor judgment at a public meeting in calling someone out of order. My Brothers' holding will not only create a vehicle for every disgruntled speaker to force his opponents into federal court; it will require local officials to second guess themselves every time they raise the gavel. Presiding officers have been running public meetings in much the same way Gott did for centuries: if he overstepped the boundary of sound judgment, he should be called to account, not under Sec. 1983, but at the ballot box.
 
 
 73
 While I recognize that nominal damages may accompany affronts to dignitary rights under Sec. 1983, Carey v. Piphus, 435 U.S. 247, 266-67, 98 S.Ct. 1042, 1053-54, 55 L.Ed.2d 252 (1978), this is not the sort of case that cries out for constitutional redress. Any compensable damages here are likely to be de minimis:
 
 
 74
 [W]hatever the constitutional basis for Sec. 1983 liability, such damages must always be designed 'to compensate injuries caused by the [constitutional] deprivation'.... That conclusion simply leaves no room for noncompensatory damages measured by the jury's perception of the abstract 'importance' of a constitutional right.
 
 
 75
 Memphis Community School Dist. v. Stachura, 477 U.S. 299, 309-10, 106 S.Ct. 2537, 2544-45, 91 L.Ed.2d 249 (1986). Both parties agree that Collinson was ruled out of order without any show of unnecessary force. Unlike previous damage actions under Sec. 1983 in which a quantifiable violation of First Amendment rights was alleged, plaintiff was not an employee who was discharged, see Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), or reassigned, Piver v. Pender County Bd. of Educ., 835 F.2d 1076 (4th Cir.1987), for speaking out in public. Moreover, local democracy abounds in dignitary affronts which are best avenged in the give and take of the political process, not through the threat of damages actions in a federal courtroom. See Hustler Magazine v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). Rudeness and intemperance on the part of a presiding officer are for the electorate to evaluate, not a federal jury. To allow the threat of a Sec. 1983 action to vindicate an interest in constitutional symbolism is to install federal damage suits as the uninhibited regulators of representative democracy and to transfer wholesale to courts the correctives that historically have been entrusted to the polling place.
 
 
 76
 The threat of personal liability for wielding a gavel in a heated public meeting will not vindicate First Amendment values by instilling in presiding officers the proper deterrent effect. To the contrary, under the rule adopted by my Brothers, it will be in the best interest of public officials to avoid holding public meetings. Fear of litigation will chill the very quality of participatory democracy that the First Amendment should protect. Ironically, the specter of prolonged and desultory public proceedings is also present. Permitting Sec. 1983 liability here will create a disincentive for presiding officers to exercise the discipline essential to the conduct of public business and the maintenance of vigorous debate. Public meetings inevitably attract a goodly number of garrulous people. Many of them are crucial to robust debate. At times, however, even the champions of democracy need to be ruled out of order on the merciful march to adjournment. I shudder to think how long some public meetings will drag on if speakers can threaten Sec. 1983 suits unless they are heard to the end.
 
 
 77
 One might think that an official like Gott could avoid the threat of litigation by adopting a neutral parliamentary rule, such as allocating each speaker a set period of time to speak. Yet this perception of public meetings flies in the face of political experience. There are often more people who wish to speak at a meeting than there is time to hear them. Are those not permitted to speak now to threaten a Sec. 1983 action on the grounds that their views were not heard because of hostility to their content? Moreover, some speakers at a public meeting may have special experiences or insights which County Commissioners wish to hear. Others, by contrast, may be repeating things said many times before. If the presiding officer then lets speaker X run over the allotted time and cuts speaker Y off before his allotted time expires, can the latter now bring a Sec. 1983 suit to determine the real reasons for that action? The conduct of local public meetings is inescapably a discretionary act. It makes no more sense to try Gott for ruling Collinson out of order than it would make to try a district judge for the discretionary curtailment of testimony at trial. The conduct of public meetings is part of the job for which commissioners, councilmen, supervisors, and aldermen are elected. My Brothers would, in my view, exchange the traditional value of town meetings for a sanitized contemporary script whose aim may be less the art of politics than the avoidance of personal liability.
 
 
 78
 This is not a case in which "an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). There were between 125 to 150 people at the public meeting, each one capable of registering a complaint at election time. Collinson himself might have devoted his energies, not to litigation, but to ensuring Gott's defeat at the polls. In declining to impose civil liability upon legislators for what they did or said in legislative proceedings, the Supreme Court concluded that "[s]elf-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses." Tenney v. Brandhove, 341 U.S. 367, 378, 71 S.Ct. 783, 789, 95 L.Ed. 1019 (1951). See also Mitchell v. Forsyth, 472 U.S. 511, 522, 105 S.Ct. 2806, 2813, 86 L.Ed.2d 411 (1985).
 
 
 79
 There is a further danger in substituting judicial correctives for political ones. Although cautionary instructions and juror challenges for cause may lessen the risk, federal trials may yet degenerate into partisan affairs if litigation provides the political opponents of presiding officers with another forum to score points. To permit Gott's political opponents to achieve through a Sec. 1983 suit the vindication they were unable to achieve at the polls is "to constitute the jury as well as the electorate as an arbiter of political outcomes" and to substitute "the civil jury for the larger, more diverse, and more representative political electorate." Hutchinson v. Miller, 797 F.2d 1279, 1285, 1287 (4th Cir.1986). Justice Frankfurter in Tenney described the importance of keeping such politics out of the courtroom:
 
 
 80
 Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies.
 
 
 81
 341 U.S. at 377-78, 71 S.Ct. at 788-89 (footnote omitted). Indeed, the immunity recognized in Tenney "was rooted in the long struggle in both England and America for legislative independence, a presupposition of our scheme of representative government." Mitchell v. Forsyth, 472 U.S. at 521, 105 S.Ct. at 2812. See also Spallone v. United States, --- U.S. ----, ----, 110 S.Ct. 625, 634, 107 L.Ed.2d 644 (1990) ("federal common law of legislative immunity" recognizes that "any restriction on a legislator's freedom undermines the 'public good' by interfering with the rights of the people to representation in the democratic process").
 
 II.
 
 82
 My Brothers' holding means that in the future the Gotts of this world will have to defend their actions twice: once before a jury and again before the electorate. This defeats the purpose of immunity for legislative acts. It is also contrary to the rationale of Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 406, 99 S.Ct. 1171, 1179, 59 L.Ed.2d 401 (1979), where the Supreme Court extended "absolute immunity from federal damages liability" even to nonelected officials at the regional level for their legislative activities. While the Court reserved the question of "[w]hether individuals performing legislative functions at the purely local level ... should be afforded absolute immunity," id. at 404 n. 26, 99 S.Ct. at 1178 n. 26, Justice Marshall noted in dissent that "the majority's reasoning ... leaves little room to argue that municipal legislators stand on a different footing than their regional counterparts." Id. at 407, 99 S.Ct. at 1180.
 
 
 83
 Numerous circuits, including this one, have extended legislative immunity to local officials in the aftermath of Lake Country. See Bruce v. Riddle, 631 F.2d 272 (4th Cir.1980) (county council members responsible for zoning ordinance afforded absolute immunity). See also Healy v. Town of Pembroke Park, 831 F.2d 989 (11th Cir.1987) (town commissioners who voted to contract out police services granted absolute immunity); Aitchison v. Raffiani, 708 F.2d 96 (3d Cir.1983) (members of borough council and mayor who voted on ordinance and borough attorney who assisted in drafting legislation protected by legislative immunity); Reed v. Village of Shorewood, 704 F.2d 943 (7th Cir.1983) (village board of trustees entitled to absolute immunity for legislative action reducing the number of liquor licenses); Kuzinich v. County of Santa Clara, 689 F.2d 1345 (9th Cir.1983) (members of local legislative bodies which enacted zoning ordinance accorded complete immunity); Gorman Towers, Inc. v. Bogoslavsky, 626 F.2d 607 (8th Cir.1980) (city directors who enacted zoning ordinance found absolutely immune from Sec. 1983 action).
 
 
 84
 Such a grant of immunity is appropriate here. Conducting a public meeting to discuss plans for the reorganization of county government fits comfortably within the definition of the legislative function originally referenced by Justice Frankfurter in Tenney and applied by this circuit in Riddle to local officials:
 
 
 85
 I will not confine it to delivering an opinion, uttering a speech ... but will extend it to the giving of a vote, ... and to every other act resulting from the nature, and in the execution, of the office....
 
 
 86
 Tenney, 341 U.S. at 371, 71 S.Ct. at 785 (quoting Coffin v. Coffin, 4 Mass. 1, 27 (1808)). The Supreme Court has noted that "[t]he essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct...." Yakus v. United States, 321 U.S. 414, 424, 64 S.Ct. 660, 667, 88 L.Ed. 834 (1944). Article I, Section 6 protects members of Congress not only for "Speech or Debate" but for "the deliberative and communicative processes" which attend the passage and consideration of legislation. Gravel v. United States, 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972). For example, "a Member's conduct at legislative committee hearings, ... may not be made the basis for a civil or criminal judgment against a Member because that conduct is within the 'sphere of legitimate legislative activity.' " Id. at 624, 92 S.Ct. at 2626 (quoting Tenney, 341 U.S. at 376, 71 S.Ct. at 788).
 
 
 87
 Gott was engaged in a legislative function. For the local official, legislative policy is determined in part through public meetings. Gott was acting in furtherance of his duties as President of the Board of Commissioners of Calvert County and chairman of the meeting when he ruled Collinson out of order. This was not an administrative action involving the issuance of a permit for which legislative immunity was denied in Scott v. Greenville County, 716 F.2d 1409 (4th Cir.1983), or an effort to enforce an existing ordinance as in Front Royal and Warren County Industrial Park Corp. v. Town of Front Royal, 865 F.2d 77 (4th Cir.1989). To the contrary, Gott's discretionary act was an integral part of the legislative process. The flow of information through that process could be severely jeopardized if every public meeting carried with it the threat of civil liability, not to mention punitive damages. The fact that Gott himself was not engaged in speech or debate does not detract from the fact that his action was within the scope of his authority as a presiding officer and within the course of consideration of the proper form of county government for Calvert County, Maryland.
 
 
 88
 In Tenney, the Supreme Court noted "the cost and inconvenience and distractions" that would impede officials in the "uninhibited discharge of their legislative duty." Tenney, 341 U.S. at 377, 71 S.Ct. at 788. Speakers appear every day before planning commissions, school boards, housing authorities, and city councils. If we are now to make a federal case of every fleeting incident involving them, the purpose of immunity for public officials will be lost.III.
 
 
 89
 The refusal of my Brothers to recognize absolute immunity for local officials who preside at public meetings undermines the rationale of Harlow v. Fitzgerald. Harlow teaches that qualified immunity doctrine is designed to prevent "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service" through proliferating lawsuits and damage awards. Harlow, 457 U.S. at 816, 102 S.Ct. at 2737. In the case of most executive officials, a grant of qualified immunity will suffice to stem litigiousness and protect the exercise of public trust. See Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). Harlow sought to assure this end by "completely reformulat[ing] qualified immunity along principles not at all embodied in the common law, replacing the inquiry into subjective malice so frequently required at common law with an objective inquiry into the legal reasonableness of the official action." Anderson v. Creighton, 483 U.S. 635, 645, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987).
 
 
 90
 Here a purely objective inquiry is impossible. Unlike a Fourth Amendment claim in which the basic question is whether an official acted on the basis of an objectively reasonable belief that a search was supported by probable cause, see Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), Harlow 's objective standard for qualified immunity contains a subjective ingredient when, as here, the underlying claim involves an element of intent. Judge Phillips' proposed rule for dealing with this situation is the following:
 
 
 91
 When a defendant's motive or intent is an element of a constitutional claim, a defendant's motion for summary judgment based upon a plausible showing of the objective reasonableness of his action, including a proper motive or intent, may not be defeated by mere conclusory assertions of improper motive or intent, but only by pointing to specific evidence of improper motive or intent.
 
 
 92
 Although this is an admirable statement of qualified immunity doctrine for cases involving a subjective element, it suffers numerous difficulties in this case. First, while Judge Phillips recognizes the "difficult conceptual problems in applying the objective test of qualified immunity to the particular type of constitutional claim here in issue," he never really addresses the appropriateness of its application in this setting. Clearly, the fact that some courts have applied qualified immunity to claims involving a subjective element does not warrant automatic transposition of the doctrine to the novel context of an officer conducting a public meeting. Such leaps allow the law to acquire a life of its own, extending the judicial reach without an accompanying rationale for judicial action.
 
 
 93
 Second, as Judge Phillips' opinion makes manifest, even an inquiry into the objective reasonableness of a presiding officer's perceptions is anything but an easy matter. Determining whether a speaker was uninformative, repetitive, or disruptive, as opposed to controversial on account of viewpoint, will prove extremely difficult. Yet this inquiry must precede the ultimate one of whether the presiding officer acted reasonably in cutting off a specific speaker. The objective aspect of the test alone leaves ample room for argument, and thus invites litigation.
 
 
 94
 Third, introduction of the subjective element into the qualified immunity calculus will make it much more difficult for courts to resolve these claims at summary judgment. With the subjective element present, the goals of Harlow will be much harder to satisfy. Despite Judge Phillips' assertions to the contrary, cases like this one will rarely be amenable to summary judgment, because motivational determinations are the presumptive province of the finder of fact. See, e.g., Charbonnages de France v. Smith, 597 F.2d 406, 415 (4th Cir.1979). Indeed, although Judge Phillips would apply his proposed rule in this case to afford Gott immunity, in future cases the rule would clearly encourage rather than prevent frivolous lawsuits against public officials like Gott.
 
 
 95
 The disagreement between my Brothers only underscores how quickly a qualified immunity inquiry will bog down this sort of case. Judge Phillips says he can point to no specific evidence suggesting that Gott intended to suppress Collinson's viewpoint. Viewing the same facts, Judge Butzner reaches a different conclusion: "A jury could find that Gott silenced Collinson because he objected to the content of Collinson's speech." Judge Phillips concedes that in future cases "circumstantial evidence" will suffice to establish a genuine issue concerning a defendant's state of mind. Such circumstantial evidence would be simple for a plaintiff to manufacture. Disgruntled plaintiffs could bring forth political statements made during a campaign or even in prior public meetings as the "circumstantial evidence" needed to set up a Sec. 1983 suit. Presiding officers will routinely be victimized by their own past political statements, which will now be offered against them by putative Sec. 1983 plaintiffs as evidence of hostility to the speaker's comments.
 
 
 96
 Such lawsuits are bound to discourage able people from seeking local public office. It will weaken good government where citizens need it most--at the local level. If qualified immunity is all that applies here, the volume of litigation resulting from solitary discretionary acts of presiding officers will continue unabated. The inevitable result is the transfer of action from council chambers to federal court. Absent a grant of absolute immunity in situations such as these, Harlow 's promise of "an entitlement not to stand trial or face the other burdens of litigation" will ring depressingly hollow. Mitchell v. Forsyth, 472 U.S. at 526, 105 S.Ct. at 2815.
 
 IV.
 
 97
 Finally, affording absolute immunity here will involve no sacrifice of First Amendment values. Almost every case relied upon by my Brothers involves a statute, ordinance, or policy to be applied with regularity throughout the community. Of course such enactments would be subject to First Amendment challenge. Gott's single discretionary act is qualitatively different, however, from an adopted policy. The Supreme Court has recognized as much in its overbreadth analysis and "never held that a statute should be held invalid on its face merely because it is possible to conceive of a single impermissible application." Broadrick v. Oklahoma, 413 U.S. 601, 630, 93 S.Ct. 2908, 2925, 37 L.Ed.2d 830 (1973) (Brennan, J., dissenting). The instant case does not present any deliberate and ongoing suppression of free expression in this community but rather an isolated and somewhat innocuous instance of arguably hasty judgment on the part of someone in elected office.
 
 
 98
 Gott's action cannot be said to pose a chilling effect upon free expression. The adverse consequences visited upon free speech were slight. No speaker was arrested; no employee was discharged from his job; no retribution of any sort was threatened by anyone in authority against any person on account of the public expression of his or her personal beliefs. The only adverse sanction applied to speech in this instance was ruling Collinson out of order. Indeed, as I have noted, the absence of absolute immunity in circumstances such as these would pose the greatest threat to First Amendment freedoms by constituting public meetings as a hatchery of civil lawsuits.
 
 V.
 
 99
 I recognize that the Supreme Court has been "quite sparing" in its grants of absolute immunity to public officials. Forrester v. White, 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988). A grant of absolute immunity defeats an action at the outset. Courts may not, under the guise of a grant of full immunity, place public officials above the law and rid themselves of actions which they do not wish to hear.
 
 
 100
 The rule of the electorate, however, may sometimes be as strict as the rule of law. "In the township, as well as everywhere else, the people are the source of power; but nowhere do they exercise their power more immediately. In America the people form a master who must be obeyed to the utmost limits of possibility." Alexis de Tocqueville, Democracy in America Vol. I at 64 (P. Bradley ed. 1945). Public meetings are preeminently political institutions. Their character will be profoundly altered and their vitality lost if they are beset by litigation based on a presiding officer's single discretionary act. Such an extension of federal jurisdiction goes far beyond the contemplation of the Congress which enacted the Reconstruction era civil rights statutes. Town meetings in this country have flourished for two centuries without the aid of 42 U.S.C. Sec. 1983. Courts must be cautious in tendering its assistance now.
 
 
 101
 BUTZNER, Senior Circuit Judge, dissenting and concurring:
 
 
 102
 * Under the doctrine of qualified immunity, a government official performing discretionary functions is protected from personal liability to the extent that his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Only if the law was "clearly established" at the time of the purported offense will the immunity defense fail, "since a reasonably competent public official should know the law governing his conduct." 457 U.S. at 818-19, 102 S.Ct. at 2738-39.
 
 
 103
 At the time of the public hearing, the law was clearly established that the First Amendment prohibits state action that imposes content-based restrictions on speech. See, e.g., Police Dep't v. Mosley, 408 U.S. 92, 95-96, 92 S.Ct. 2286, 2289-90, 33 L.Ed.2d 212 (1972). Where speech is allowed in a public arena, the government may impose valid time, place, and manner restrictions but the restrictions must be content neutral. Heffron v. International Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 647-48, 101 S.Ct. 2559, 2563-64, 69 L.Ed.2d 298 (1981).
 
 
 104
 Content-based restrictions may be imposed, however, where there is "a clear and present danger that [the speech] will bring about the substantive evils that [government] has a right to prevent." Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919). The substantive evils which warrant suppression of speech must "rise far above public inconvenience, annoyance, or unrest." Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949); see also City of Houston v. Hill, 482 U.S. 451, 461, 107 S.Ct. 2502, 2509, 96 L.Ed.2d 398 (1987).
 
 
 105
 Maryland law implements the protection afforded by the First Amendment. It clearly defines the authority of a presiding officer when a public body meets in open session: "If the presiding officer determines that the behavior of an individual is disrupting an open session, the public body may have the individual removed." Md. State Gov't Code Ann. Sec. 10-507(b)(1) (1984). There can be little doubt that Gott knew or should have known that expulsion of Collinson, unless he was disruptive, would "violate clearly established statutory or constitutional rights." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738.
 
 
 106
 I agree with the district court that a genuine issue of material fact exists concerning the necessity of silencing Collinson. Since Collinson did not exceed his allotted time of two minutes, Gott's action cannot be construed as a valid time restriction. Gott averred in his affidavit that he feared a disturbance would result if he did not ban the discussion of certain subjects. Yet, in Gott's deposition, he testified that he did not silence Collinson because he feared disorder. He added if he did not prevent Collinson from discussing "personalities," all of the other speakers would attempt to discuss "personalities."
 
 
 107
 A jury could find that Gott silenced Collinson because he objected to the content of Collinson's speech. Other issues are whether Gott warned against discussing personalities and whether Collinson's speech and the attendant atmosphere at the meeting should have induced a presiding officer reasonably to have believed that it was necessary to silence Collinson by expulsion in order to avert disruption or an immediate threat to public peace. See Harlow, 457 U.S. at 818-19, 102 S.Ct. at 2738-39; see also Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1940); Stromberg v. California, 283 U.S. 359, 368-69, 51 S.Ct. 532, 535-36, 75 L.Ed. 1117 (1931); Schenck, 249 U.S. at 52, 39 S.Ct. at 249.
 
 
 108
 Because the evidence concerning these issues is in conflict, I would affirm the district court's order denying Gott's motion for summary judgment seeking qualified immunity.
 
 II
 
 109
 There never was an issue in this case about absolute immunity. Gott did not claim absolute immunity in the district court. The district judge never discussed absolute immunity. Instead, it decided the motion for summary judgment on the basis of Gott's lack of qualified immunity. On appeal Gott did not seek to make absolute immunity an issue. He never claimed it. The parties did not brief whether he was, or was not, entitled to its protection.
 
 
 110
 Gott's counsel cannot be faulted for not raising the issue. Maryland law does not accord the presiding officer of a public body absolute immunity for expelling a citizen from an open session. Collinson has called our attention to Md. State Gov't Code Ann. Sec. 10-507 (1984), which provides:
 
 
 111
 (a) In general.--Whenever a public body meets in open session, the general public is entitled to attend.
 
 
 112
 (b) Removal of individuals.--(1) If the presiding officer determines that the behavior of an individual is disrupting an open session, the public body may have the individual removed.
 
 
 113
 (2) Unless the public body or its members or agents acted maliciously, the public body, members, and agents are not liable for having an individual removed under this subsection.
 
 
 114
 The parties had no cause to brief whether a federal court should disregard this provision of Maryland law when considering the question of absolute immunity. It is clear, however, that the Maryland legislature does not perceive the dire consequences that sometimes color claims that absolute immunity is essential for the conduct of public affairs.
 
 
 115
 Generally courts will not decide issues that were never raised. On occasion, when a question of extraordinary importance arises that was not considered by the parties, a court will address it. But even then the court should afford the parties the opportunity to brief it. See, e.g., Schlesinger v. Councilman, 420 U.S. 738, 743-44, 95 S.Ct. 1300, 1305-06, 43 L.Ed.2d 591 (1975). Collinson was never given an opportunity to debate the argument that Gott is entitled to absolute immunity. Nevertheless, he now finds his action defeated in part for reasons that are foreign to the case.
 
 III
 
 116
 I concur in the judgment absolving the other defendants from liability.
 
 
 
 *
 This is disputed. The transcript of the hearing showed no such statement by Gott; the official minutes indicated that such a statement was made at some time. Confronted with the transcript, Gott continued to assert that he had made the statement, and asserted that in this and other respects the transcript failed to include everything said by him and others at the meeting. Gott's counsel conceded that for purposes of the summary judgment motion, this fact is in genuine issue
 
 
 [1]
 The parties have joined issue throughout on the assumption that while presiding over a public meeting an official such as Gott is exercising discretionary powers in an executive function, hence may be entitled, depending upon the circumstances, to qualified immunity under the test for that form of immunity described in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This has been Gott's specific claim of official immunity throughout, and was the theory upon which the district court analyzed Gott's motion for summary judgment
 I accept the parties' assumptions that this is the issue properly presented by Gott's appeal as both substantively correct, see Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 3040-41, 97 L.Ed.2d 523 (1987) (emphasizing that qualified immunity doctrine applies "across the board" to all officials exercising discretionary executive functions, whatever the particular conduct and right at issue), and procedurally compelled, see Singleton v. Wulff, 428 U.S. 106, 120-21, 96 S.Ct. 2868, 2877-78, 49 L.Ed.2d 826 (1976) (stating general rule that appellate court is limited to consideration of issues passed upon by trial court).
 
 
 [2]
 One court of appeals had by then, in the course of rejecting such a claim on the facts of the case, apparently assumed without directly holding that first amendment rights could be violated by such parliamentary rulings. See Wright v. Anthony, 733 F.2d 575 (8th Cir.1984) (enforcement of time limit not a violation)
 Since the time of Gott's act, two courts of appeals have considered claims comparable to Collinson's here. In both, Musso v. Hourigan, 836 F.2d 736 (2d Cir.1988), and Jones v. Heyman, 888 F.2d 1328 (11th Cir.1989), the courts recognized that first amendment rights might be violated by parliamentary rulings, but reached divergent results on the merits. In Musso, the Second Circuit upheld a district court's denial of summary judgment by reason of qualified immunity to officials who allegedly silenced the plaintiff at a public meeting. In Jones, the Eleventh Circuit, conducting a de novo "constitutional fact" review, reversed a district court judgment that awarded substantial compensatory and punitive damages against a mayor who, as presiding officer, had ruled out of order, then evicted, a speaker at a public hearing.
 
 
 [3]
 The "disruption" to which this interest extends--as an "evil" to be avoided--is of course not confined to raw, physical violence, but includes any conduct that significantly violates generally or specially established rules of parliamentary order, and "disrupts" by that means the orderly conduct of a meeting
 
 
 [1]
 Judge Phillips and I thus agree, for much different reasons, that Gott is entitled to summary judgment by reason of immunity from suit. I also concur in the affirmance of the grant of qualified immunity to deputies Nutter and Bowen, and I agree with the entry of summary judgment in favor of the Calvert County Board of Commissioners
 
 
 [2]
 My Brothers maintain that we are precluded from considering Gott's absolute immunity from suit because the issue was not addressed below or on appeal. However, the issue of immunity from suit is front and center here, and the scope of immunity is what this case is all about. Both absolute and qualified immunity exempt officials from liability to the degree appropriate to the official function discharged. Forrester v. White, 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988). It is improper to split the immunity issue into seemingly unrelated fragments of qualified and absolute immunity in order to find a procedural waiver of the latter protection. Official immunity from suit was addressed below, and we have a duty to consider the appropriateness of the type of immunity afforded there. In fact, the danger in ruling on grounds other than absolute immunity is precisely that qualified immunity will incorrectly be accepted as the norm of immunity in this type of case