Arthur WILKINSON

v.

**BENSALEM TOWNSHIP, et al.**

Civ. A. No. 92–5297.

United States District Court,
E.D. Pennsylvania.

April 16, 1993.

Eric B. Schnurer, Lawrence M. Otter, Galfand, Berger, Lurie & March, Philadelphia, PA, for plaintiff.

Stephen G. Rhoads, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for defendants.

## MEMORANDUM

DALZELL, District Judge.

Plaintiff, Arthur Wilkinson, has brought this action under 42 U.S.C. § 1983 and § 1985(3) [1] against Bensalem Township (the "Township"), Joseph Szafran, who is Bensalem Township Council President, Trish Dornisch and David Costello, Bensalem Township Councilmembers, for allegedly violating his First Amendment right to freedom of expression, particularly at a Township Council public meeting in the summer of 1992.

Now before us are plaintiff's motion for partial summary judgment and defendants' motion for summary judgment. For the reasons that follow, we shall deny plaintiff's motion and grant in part and deny in part defendants' motion.

### I. *Factual Background*

Wilkinson alleges that the defendants deprived him of his First Amendment right to address the Bensalem Township Council (the "Council") during the public portion of the August 24, 1992, Council meeting. Consistent with its routine practice, Council requested that all those who wished to speak at the meeting fill out a card. Wilkinson, a Bensalem Township citizen, completed a card showing his desire to address Council, and handed it to Council President Szafran (*see* Affidavit of Jane Faust ¶ 7 attached to Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment).

According to the testimony of Councilwoman Jane Faust, as the public portion of the meeting approached she overheard Councilwoman Trish Dornisch repeatedly insist to Szafran, "Don't let him talk" (*id.* ¶ 8). She also testified that during a five minute recess just before the public portion of the evening's meeting, she overheard Councilman David Costello say to Szafran, "You're the chairman—you don't have to let him talk" (*id.*

¶ 9). At the time Faust overheard these statements, she assumed they referred to someone other than Wilkinson, but when the Council allowed this other individual to speak, Faust realized that the defendants' comments referred to Wilkinson. (*Id.* ¶¶ 9–10).

When everyone, except Wilkinson, who had expressed a desire to speak had addressed the Council, Szafran called for a motion to close the public portion of the evening's meeting. At this time, Wilkinson rose and the following exchange ensued:

Wilkinson: Mr. President, did you lose my request?

Szafran: No, I didn't. Unless you are prepared to apologize to council, I can't address you right now.

Wilkinson: I'm sorry.

Szafran: You heard me.

Wilkinson: So I will be excluded from further discussion of the meeting?

Szafran: I have a *motion on the floor*, and I have a second. Any further comment or question on that? I'll call the vote.

(Transcript of August 24, 1992 meeting of Bensalem Township Council at pp. 175–76, hereinafter referred to as "August 24 Transcript").

The meeting then proceeded to other business, which lasted about another two hours. Around midnight, when Council had concluded all other business, Township Solicitor Darrel Zazslow called the Council into executive session (*see* Affidavit of Jane Faust ¶ 13). When the Council emerged from executive session, only five people remained, Wilkinson among them, out of the seventy-five present when the meeting began almost five hours earlier (*see id.* ¶¶ 14–15). Szafran reopened the public portion of the meeting to permit Wilkinson an opportunity to speak. Wilkinson refused, claiming that the delay and late hour did not provide him with a fair opportunity to be heard.[2]

---

**1.** Pursuant to our Order of January 15, 1993, we granted defendants' motion to dismiss plaintiff's claim under 42 U.S.C. § 1985(3).

**2.** The transcript of the August 24 meeting states that it began at 7:40 p.m. and concluded at 11:10 p.m. The unauthenticated "Minutes" attached to the transcript state that the meeting went into

Executive Session at midnight and ended at 12:05 a.m. The affidavit of Jane Faust states at ¶ 14 that the Executive Session ended at 12:15 a.m., at which time "Chairman Szafran informed Art that he would be allowed to speak at that time." Faust Affidavit ¶ 15.

On September 14, 1992, Wilkinson filed this action asserting two counts. The First, and only remaining Count of the complaint, avers that the defendants violated Wilkinson's First Amendment right to freedom of expression under the United States Constitution because they impermissibly imposed a content-based restriction.

## II. *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law, *id.* at 248, 106 S.Ct. at 2510, and all inferences must be drawn, and all doubts resolved, in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

On a motion for summary judgment, the moving party bears the initial burden of identifying for the Court those portions of the record that it believes demonstrate the absence of dispute as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party "may not rest upon the mere allegations or denials of [its] pleading, but [its] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2510.

## III. *Legal Analysis*

■ Qualified immunity insulates a governmental official from liability for civil damages when the discretionary conduct of that official "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This objective standard "is deliberately designed to give protection 'to all but the plainly incompetent or those who knowingly violate the law' ..." *Collinson v. Gott,* 895 F.2d 994, 998 (4th Cir.1990) (Phillips, J., concurring), citing *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

■ When analyzing a claim of qualified immunity, we must "first ... identify the specific constitutional right allegedly violated, then ... inquire whether at the time of the alleged violation it was clearly established, then further ... inquire whether a reasonable person in the official's position would have known that his conduct would violate that right." *Collinson,* 895 F.2d at 998 (Phillips, J., concurring). The first two prongs of this inquiry are pure questions of law for the court to decide. *See id.,* citing *Anderson v. Creighton,* 483 U.S. 635, 637–43, 107 S.Ct. 3034, 3038–40, 97 L.Ed.2d 523 (1987); *Mitchell v. Forsyth,* 472 U.S. 511, 535 n. 12, 105 S.Ct. 2806, 2820 n. 12, 86 L.Ed.2d 411 (1985). The third prong is an application of *Harlow*'s objective standard, which sometimes requires courts to make factual determinations concerning a defendant's conduct and its circumstances, but ultimately it, too, devolves into a matter of law for the court. *See Collinson,* 895 F.2d at 998 (Phillips, J., concurring); *Anderson v. Creighton,* 483 U.S. at 646 n. 6, 107 S.Ct. at 3042 n. 6.

■ Turning to the first prong of our inquiry, clearly the right involved is Wilkinson's right to free expression, under the First and Fourteenth Amendments, absent any state-imposed restriction on its content. This right is not unlimited. In a government-designated public forum, the state may limit free expression by reasonable time, place, and manner restrictions on speech, so long as they are content-neutral and are narrowly tailored to serve a significant governmental interest. *Perry Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37,

45–6, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

■ The state may impose a content-based restriction only if there is "a clear and present danger that [the speech] will bring about the substantive evils that [government] has a right to prevent." *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919). The evil justifying such a restriction must "rise[ ] far above public inconvenience, annoyance, or unrest." *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949).

As to the second prong of our inquiry, we find that at the time of the alleged incident the boundaries of the First Amendment right in the context before us were well established for purposes of qualified immunity. In cases factually similar to the one before us, courts have consistently recognized that local officials presiding over duly-called public meetings may offend First Amendment rights when they make *ad hoc* parliamentary rulings. *See Collinson,* 895 F.2d 994; *Jones v. Heyman,* 888 F.2d 1328 (11th Cir.1989); *Musso v. Hourigan,* 836 F.2d 736 (2d Cir. 1988); *Brown v. Smythe,* 780 F.Supp. 274 (E.D.Pa.1991).

■ The third prong requires us to consider the heart of the matter before us. It also presents us with a subtle issue regarding the objectiveness of *Harlow*'s standard. We recognize that the *Harlow* test is objective in the sense that it precludes us from inquiring into whether the relevant government actor was actually aware of the legal standards in question; rather, "the official is charged with such knowledge if the appropriate legal standard is, by objective standards, clearly established at the time the official undertook the activity at issue." *Musso,* 836 F.2d at 743. Both the Second Circuit in *Musso* and Judge Phillips in his concurring opinion in *Collinson,* however, recognized that although *Harlow* enunciated an objective test, it "cannot in the end avoid the necessity to inquire into official motive or intent or purpose when such states of mind are essential elements of the constitutional right allegedly violated." *Collinson* 895 F.2d at 1001–02 (Phillips, J., concurring); *see also Musso,* 836 F.2d at 743. This states the precise problem here.

### A. The Claim Against Council President Szafran

Wilkinson claims that Szafran did not permit him to speak at the August 24 Council meeting because Szafran disliked him or because Szafran did not care for comments Wilkinson had made at previous Council meetings. Szafran asserts that his actions were entirely consistent with typically-recognized reasonable restrictions on time, place, and manner. He maintains that his "actions were *not directed at the content* of Wilkinson's speech, but were instead directed at the *manner* of his speech and were necessary to prevent undue and continued disruption of the meeting by Wilkinson" (Defendants' Counter–Motion for Summary Judgment at pp. 10–11, hereinafter referred to as "Defendants' Motion") (emphasis in original).

■ *If,* after a trial, we as the finder of fact subscribe to Wilkinson's characterization of Szafran's motives, then we may conclude a reasonable person in Szafran's position would have known that his conduct violated clearly established First Amendment standards. The First Amendment extends not only to the content of a person's speech, but to the speaker himself. *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 784–85, 98 S.Ct. 1407, 1420, 55 L.Ed.2d 707 (1978). This is sensible because of the often impossible task of distinguishing the message from the messenger. Allowing the state to restrict a person's right to speak based on their identity could quickly lead to the censorship of particular points of view. *See, e.g.,* Laurence H. Tribe, American Constitutional Law, § 12–3, at 796 (2d ed. 1988). Such a result would offend the very core of the First Amendment's protections. Therefore, if Szafran prohibited Wilkinson from speaking because he simply did not like him, Szafran violated Wilkinson's First Amendment rights. Moreover, if Szafran did not allow Wilkinson to speak because, based on prior experience, he knew he did not want to hear what Wilkinson had to say on matters of public concern, then this, too, would constitute an impermissible content-based restriction.

It is equally true, however, that if we believe Szafran's characterization of his motive, to keep the meeting under control and

free from rude and irrelevant disruption, then he acted permissibly, without regard to viewpoint or content. *See Collinson,* 895 F.2d at 1003 (Phillips, J., concurring). In short, Szafran could "rule [Wilkinson] out of order [and not permit him to speak] if he had reason to believe that [action] necessary to avoid disruption of the orderly conduct of the meeting, [but] he could not constitutionally do so if he had no reasonable basis for fearing disruption, or if his actual purpose was to prevent expression of [Wilkinson's] viewpoint . . ." *Collinson,* 895 F.2d at 1000 (Phillips, J., concurring).

The undisputed evidence shows that Wilkinson spoke at a Council meeting held on July 27, 1992. At that meeting, Szafran and Wilkinson engaged in a heated exchange over matters of public concern. Whether one could characterize Wilkinson's behavior as rude and disruptive is debatable (*see* Transcript of July 27, 1992 Meeting of Bensalem Township Council at pp. 81–5, 119–20, 127–28, 131, 159, 176–77, 193–95). Additionally, sometime in late June or early July of 1992, Szafran received the following message on his answering machine from Wilkinson:

> Hey Joe, this is Art Wilkinson, I just got up and had a chance to read the paper and take a look at your glorious and grand comments made to Adam Bell. I think that a good thing for you to do between now and Monday night's meeting would be to go the [*sic*] Bucks County Courthouse

and change your name to Costello or Burns because that way I'll feel more comfortable in coming after you like I'm gonna start coming after you now, o.k.? So long. (Exhibit "C", Transcript of recorded telephone message and Affidavit of Joseph Szafran attached to Defendants' Motion). At an August 24, 1992 Council meeting, Szafran would not permit Wilkinson to speak during the public portion of the meeting, unless he apologized for his past behavior, even though Wilkinson had complied with all of the requirements necessary to participate.

 After making a credibility determination at trial we could reasonably draw an inference that Szafran singled out Wilkinson on August 24 because of his dislike of him or of what he had to say. Certainly, Szafran's apparent willingness to permit Wilkinson to speak if he apologized undermines the weight of his proffered motive for silencing Wilkinson. On the other hand, after considering all of the evidence, we could also find, at least on summary judgment motions, that Szafran did not permit Wilkinson to speak in order to keep the meeting under control and free from rude and irrelevant disruption.[3] Thus, a genuine issue of material fact exists regarding Szafran's motive for silencing Wilkinson.[4] Accordingly, we shall deny plaintiff's motion for partial summary judgment and defendants' motion for summary judgment with respect to Szafran.

3. We note that for Wilkinson to prevail at trial we must only reject Szafran's proffered motive. We need not go further and accept the motive that Wilkinson has assigned to Szafran's conduct. This is so because Szafran acted impermissibly when he conditioned Wilkinson's right to speak on an apology, if he imposed this condition for any reason other than to keep the meeting under control and free from disruption. The state may not condition the exercise of First Amendment liberties on the surrender of other constitutional rights. *See Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963). The right not to speak—here, the right to refrain from apologizing—is certainly encompassed within the First Amendment's protections. *See e.g. Pacific Gas & Elec. Co. v. Pub. Utilities Comm'n of California,* 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (state cannot require utility to enclose newsletter of consumer ratepayer organization in its monthly mailing to consumers); *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (state cannot require an individual to display message

"Live Free or Die" on car license plate). Thus, Szafran could not condition Wilkinson's right to speak at a public portion of a council meeting on his complying with the requirement that he utter a public apology for prior speech Szafran found offensive.

4. Szafran also argues that even if his initial denial of Wilkinson's request to address Council was unconstitutional, he permitted Wilkinson the opportunity to speak later that evening. Thus, he argues that he eventually provided Wilkinson with an opportunity to enjoy his First Amendment rights, however late the hour (*see* Defendants' Motion at p. 14). If at trial we find Szafran's actions unconstitutional, the fact that he restored Wilkinson's First Amendment rights is certainly relevant to the question of damages. It does not, however, vaccinate Szafran against liability. As the Supreme Court stated in *Elrod v. Burns,* "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976).

### B. The Claims Against Councilwoman Dornisch and Councilman Costello

Wilkinson claims that Dornisch and Costello joined in with Szafran in suppressing his right to speak. He points to the testimony of Councilwoman Jane Faust as evidencing an agreement between these individuals to deny him his civil rights.

The undisputed material facts show that both Dornisch and Costello commented to Szafran before the meeting began that they believed the Council did not have to permit Wilkinson to speak that evening (*see* Affidavit of Jane Faust ¶¶ 8–9; Exhibit "E", Affidavit of Trish Dornisch ¶ 5 attached to Defendants' Motion; Exhibit "F", Affidavit of David Costello ¶ 5 attached to Defendants' Motion). It was Szafran alone, however, as chairman of the meeting, who prohibited Wilkinson from speaking (*see* August 24 Transcript at pp. 175–76; Affidavit of Trish Dornisch ¶ 6; Affidavit of David Costello ¶ 6).

■ Wilkinson has not presented any evidence to show that Dornisch and Costello joined with Szafran in allegedly depriving him of his First Amendment rights. On the contrary, the transcript of the August 24 meeting reveals, and the defendants concede, that the power to yield the floor to an individual who wished to speak lay solely with Szafran, in his capacity as Council President (*see* August 24 Transcript at pp. 175–76 and Defendants' Motion at pp. 16–17). Under these circumstances, no "fairminded [finder of fact] could return a verdict for the plaintiff on the evidence presented", *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252, 106 S.Ct. at 2512.

■ Moreover, any claim Wilkinson is asserting against Dornisch and Costello for failing to prevent Szafran from violating his First Amendment rights must fail as a matter of law. As the Second Circuit stated in *Musso:*

> As a general rule, a government official is not liable for failing to prevent another from violating a person's constitutional rights, unless the official is charged with an affirmative duty to act.

836 F.2d at 743, referring to *Rizzo v. Goode,* 423 U.S. 362, 376–77, 96 S.Ct. 598, 606–07, 46 L.Ed.2d 561 (1976). That Court went on to conclude, and we agree, that no such "clearly established" affirmative duty to prevent one council member from infringing the First Amendment interests of a potential speaker existed. *Id.* at 743–44.

Dornisch and Costello had no affirmative, clearly established duty as Councilmembers to prevent Szafran's alleged infringement of Wilkinson's constitutional rights. We therefore conclude that the doctrine of qualified immunity protects their failure to act. Consequently, we shall grant defendants' motion for summary judgment with respect to Dornisch and Costello.

### C. The Claim Against Bensalem Township

Wilkinson claims that we should not grant summary judgment to the Township because "[a] municipality acts through its agents, who in this case are a majority of the Bensalem Township Council" and they "created the requisite policy which makes it liable for the illegal act to suppress Mr. Wilkinson's Constitutional rights ..." (Plaintiff's Memorandum of Law in Opposition to Defendants' Counter–Motion for Summary Judgment at pp. 6–7).

The Supreme Court's teaching in *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978) is squarely contrary to plaintiff's statement:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

■ To prevail on the theory that Szafran implemented a custom or policy of the Township which violated Wilkinson's rights, Wilkinson must show that the Township's failure to educate its Councilmembers about the state of the law was an established practice " 'so permanent and well settled as to constitute a "custom or usage" with the force of law.' " *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036, quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970). To support a finding of

"policy or custom", Wilkinson must at least show that the municipality did not implement necessary training to ensure that employees would not violate the constitutional rights of the persons with whom they came into contact. *Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Specifically, Wilkinson must prove:

> [I]n light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Id.* 489 U.S. at 390, 109 S.Ct. at 1205.

■ Wilkinson has not presented any evidence to meet this stringent standard. There is no evidence that the Township embraced any policy of silencing citizens at public hearings, or that it directly or by knowing inaction condoned Szafran's conduct. Furthermore, we agree with Judge Phillips's reasoning in *Collinson,* and find that we cannot consider Szafran's isolated act an exercise of policymaking power by one empowered to "make policy" for the Township in the matter at issue. *Collinson,* 895 F.2d at 1004 (Phillips, J., concurring), citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481–83 & nn. 9, 12, 106 S.Ct. 1292, 1299–300 & nn. 9, 12, 89 L.Ed.2d 452 (1986).

As a matter of law, therefore, the Township cannot be liable to Wilkinson as a result of Szafran's actions. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 124, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). Thus, we shall grant defendants' motion for summary judgment with respect to the Township.

## IV. *Conclusion*

We recognize that presiders over public meetings have, as their central duty, the obligation to maintain order and keep the discussion to germane matters. Free expression can quickly be stifled by the din of a free-for-all. On the other hand, citizens have a right, subject to basic restrictions of good order, to be difficult, even offensive to public officials on matters of public concern. There are, however, limits on the duration of invective that a presider and meeting participants must endure.

This is, in short, a very difficult line to draw in an area of core First Amendment concerns. It should not be drawn on a summary judgment record. We shall therefore deny Wilkinson's motion for partial summary judgment. To the extent of the foregoing analysis we shall also grant in part and deny in part defendants' motion for summary judgment.