63 F.3d 295
 64 USLW 2104
 William BERKLEY, Jr.; Carrie L. Chance; Allen R. Copley;
Alfred J. Carey; Harmon H. Marks; Basil S.
Scott; William F. Thaxton, Plaintiffs-Appellants,
v.
The COMMON COUNCIL OF the CITY OF CHARLESTON, Defendant-Appellee.
Regina Alexander, Amicus Curiae.
 No. 94-1121.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 6, 1995.
Decided Aug. 11, 1995.
 
 ARGUED: James Anthony McKowen, Hunt, Lees, Farrell & Kessler, Charleston, WV, for appellants. John Richard Fowler, Huddleston, Bolen, Beatty, Porter & Copen, Charleston, WV, for appellee. ON BRIEF: Blake Benton, Huddleston, Bolen, Beatty, Porter & Copen, Charleston, WV, for appellee. Martha A. Geer, Patterson, Harkavy & Lawrence, Raleigh, NC, for amicus curiae.
 Before ERVIN, Chief Judge, RUSSELL, WIDENER, HALL, MURNAGHAN, WILKINSON, WILKINS, NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 Reversed and remanded by published opinion. Judge LUTTIG wrote the majority opinion, in which Chief Judge ERVIN, Judges HALL, MURNAGHAN, WILKINS, NIEMEYER, HAMILTON, WILLIAMS, MICHAEL, and MOTZ and Senior Judge PHILLIPS joined. Senior Judge PHILLIPS wrote a special concurring opinion, in which Chief Judge ERVIN and Judge MURNAGHAN joined. Judge WIDENER wrote a dissenting opinion. Judge WILKINSON wrote a dissenting opinion, in which Judge RUSSELL and Judge WIDENER joined.
 OPINION
 LUTTIG, Circuit Judge:
 
 
 1
 We heard this case en banc to decide whether a municipality, here the City of Charleston, is entitled to absolute immunity from liability under 42 U.S.C. Sec. 1983 for the unconstitutional enactments and actions of its local legislature. The numerous circuits that have addressed the question have unanimously concluded, in recognition of Supreme Court precedent, that municipalities are not entitled to such an immunity. We now join our sister circuits and hold that a municipality is not immune from liability under section 1983 for the enactments and actions of the local legislative body.
 
 I.
 
 2
 In Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities and other local governments are "persons" subject to liability for constitutional violations under 42 U.S.C. Sec. 1983. Id. at 690, 98 S.Ct. at 2035-36. A municipality may only be found liable under section 1983, however, where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Id. Since Monell, municipalities and local governments have repeatedly, and unsuccessfully, attempted to secure some immunity from liability in suits brought under section 1983.
 
 
 3
 In the course of adjudicating these various claims to immunity, the Supreme Court has left no doubt that municipalities and local governments are not entitled to immunity from suits brought under section 1983. Chief Justice Rehnquist, writing for a unanimous Court, could not have been any clearer when he observed recently that "unlike various government officials, municipalities do not enjoy immunity from suit--either absolute or qualified--under Sec. 1983." Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, --- U.S. ----, ----, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517 (1993). The Chief Justice based his observation in Leatherman on the Court's decision in Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), where, in denying municipalities a qualified immunity defense to claims brought under section 1983, see id. at 650, 100 S.Ct. at 1415, the Court "held" that "municipalities have no immunity from damages liability flowing from their constitutional violations," id. at 657, 100 S.Ct. at 1418. In the face of such clear and broad pronouncements by the Supreme Court, we have little trouble concluding that a municipality is not immune from section 1983 liability for unconstitutional enactments and other legislative activities of the local legislature.[1]
 
 
 4
 Apart from the unequivocal statements in the Court's opinions, the reasoning employed by the Court in Owen forecloses any other conclusion. In Owen, the Court explained that it will only recognize an immunity from suit under section 1983 where "a tradition of immunity was so firmly rooted in the common law [at the time of the statute's enactment] and was supported by such strong policy reasons that 'Congress would have specifically so provided had it wished to abolish the doctrine.' " Id. at 637, 100 S.Ct. at 1408. After surveying the common law at the time of the enactment of section 1 of the Civil Rights Act of 1871, the predecessor statute to section 1983, and after evaluating the public policy considerations behind municipal liability, the Court held that there was no justification in history or tradition, or in policy, for affording municipalities immunity from suit under section 1983.
 
 
 5
 With regard to the inquiry into tradition, the Court unqualifiedly concluded that "there is no tradition of immunity for municipal corporations." Id. at 638, 100 S.Ct. at 1409. Though the Court was able to identify two common law doctrines that might have served as a basis for municipal immunity, it held that neither of these immunities survived Congress' enactment of section 1 of the Civil Rights Act of 1871. Id. at 644, 100 S.Ct. at 1412.
 
 
 6
 The first of these common law doctrines "sought to distinguish between a municipality's 'governmental' and 'proprietary' functions," with the municipality subject to liability for the latter, but immune from liability as to the former. Id. The Court found that by 1871, the immunity from suit for a municipality's "governmental functions" had largely been "nullified" by the states. Id. at 645-46, 100 S.Ct. at 1412-13; see also id. at 646, 100 S.Ct. at 1413 (referring to "nominal existence" of such an immunity). In any event, because the governmental function immunity was rooted in principles of sovereign immunity, id. at 645, 100 S.Ct. at 1412, the Court held that the immunity was "obviously abrogated" by the enactment of section 1983, id. at 647, 100 S.Ct. at 1413:
 
 
 7
 By including municipalities within the class of "persons" subject to liability for violations of the Federal Constitution and laws, Congress--the supreme sovereign on matters of federal law--abolished whatever vestige of the State's sovereign immunity the municipality possessed.
 
 
 8
 Id. at 647-48, 100 S.Ct. at 1413-14 (footnote omitted).
 
 
 9
 The Court in Owen identified as a second common law protection available to municipalities in the nineteenth century a doctrine that "immunized a municipality for its 'discretionary' or 'legislative' activities," but which did not protect municipalities from liability for acts "ministerial" in nature. Id. at 644, 100 S.Ct. at 1412. This doctrine was grounded in separation of powers principles, the concern being that "[f]or a court or jury ... to review the reasonableness of the city's judgment on [discretionary or legislative] matters would be an infringement upon the powers properly vested in a coordinate and coequal branch of government." Id. at 648, 100 S.Ct. at 1414. As it had found with the municipality's common law immunity from liability for its "governmental" actions, the Court found the municipality's immunity from liability for its "discretionary" or "legislative" activities to be largely hollow at the time Congress enacted the Civil Rights Act of 1871. Id. at 649, 100 S.Ct. at 1414. More importantly, the Court found that the very rationale behind the immunity for discretionary activities precluded any claim that the immunity survived the enactment of section 1983:
 
 
 10
 Th[e] common-law doctrine [of legislative or discretionary immunity] merely prevented courts from substituting their own judgment on matters within the lawful discretion of the municipality. But a municipality has no "discretion" to violate the Federal Constitution; its dictates are absolute and imperative. And when a court passes judgment on the municipality's conduct in a Sec. 1983 action, it does not seek to second-guess the "reasonableness" of the city's decision nor to interfere with the local government's resolution of competing policy considerations. Rather, it looks only to whether the municipality has conformed to the requirements of the Federal Constitution and statutes.
 
 
 11
 Id. The Court in Owen thus rejected any sovereign immunity or separation of powers justification for municipality immunity from suit under section 1983, and the Court was able to identify no other possible historical or doctrinal source of immunity from suit for constitutional violations.
 
 
 12
 If there were any doubt that the Court's pronouncements in Leatherman and Owen, coupled with the Court's reasoning in Owen, preclude the municipal legislative immunity asserted in this case, it is obvious from the facts before the Court in Owen that the abrogation of municipality immunity effected by section 1983 extends as well to a municipality's legislative activities. In Owen, the local Chief of Police claimed that the City of Independence, the City Manager, and members of the City Council in their official capacity, had deprived him of his protected liberty interest in his "good name, reputation, honor, or integrity" without due process of law, in violation of the Fourteenth Amendment. Id. at 633 n. 13, 100 S.Ct. at 1406 n. 13 (quoting Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971)). Specifically, he alleged that "the city--through the unanimous resolution of the City Council--released to the public an allegedly false statement impugning [his] honesty and integrity." Id.[2] Thus, the plaintiff in Owen, like the plaintiffs in this case, directly challenged the city's exercise of a core legislative function, embodied in an official vote of the local legislative body.[3] After considering both the nature of the asserted constitutional violation and the City Council's role in causing the violation, the Court was left with "no doubt that the Court of Appeals correctly concluded that the city's actions deprived petitioner of liberty without due process of law." Id. The Court's denial to the municipality of a qualified immunity defense for the unconstitutional legislative activities in Owen leads inescapably to the conclusion that a municipality is not entitled to an absolute immunity for the very same governmental conduct. See, e.g., Hollyday v. Rainey, 964 F.2d 1441, 1445 (4th Cir.) (opinion of Luttig, J.) ("The reasoning of the Court in Owen would appear to apply with equal force to a claim of absolute municipal immunity based upon the testimonial privilege of the municipality's officers and agents."), cert. denied, --- U.S. ----, 113 S.Ct. 636, 121 L.Ed.2d 567 (1992).
 
 
 13
 Indeed, the Court routinely cites the enactment of legislation as the prototypical government conduct that can give rise to liability under Monell 's "policy or custom" requirement. In Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), for instance, a majority of the Court joined Justice Brennan's observation that "[n]o one has ever doubted ... that a municipality may be liable under Sec. 1983 for a single decision by its properly constituted legislative body ... because even a single decision by such a body unquestionably constitutes an act of official government policy." Id. at 480, 106 S.Ct. at 1298; see also id. at 483 n. 12, 106 S.Ct. at 1300 n. 12 (plurality) ("[I]f county employment policy was set by the Board of County Commissioners ... that body's decisions would provide a basis for county liability."). Even the dissenters in Pembaur agreed that an unconstitutional enactment of a local legislature could give rise to municipal liability under section 1983:
 
 
 14
 Another factor indicating that policy has been formed is the process by which the decision at issue was reached. Formal procedures that involve, for example, voting by elected officials, prepared reports, extended deliberation, or official records indicate that the resulting decisions taken "may fairly be said to represent official policy." Monell, supra, [436 U.S.] at 694 [98 S.Ct. at 2037]. Owen v. City of Independence, 445 U.S. 622 [100 S.Ct. 1398, 63 L.Ed.2d 673] (1980), provides an example. The City Council met in a regularly scheduled meeting. One member of the Council made a motion to release to the press certain reports that cast an employee in a bad light. After deliberation, the Council passed the motion with no dissents and one abstention. Id. at 627-29 [100 S.Ct. at 1403-04]. Although this official action did not establish a rule of general applicability, it is clear that policy was formed because of the process by which the decision was reached.
 
 
 15
 Pembaur, 475 U.S. at 500, 106 S.Ct. at 1309 (Powell, J., dissenting). And in City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), a case in which the Court divided three ways over the proper standard for determining when municipal action amounts to a custom or policy, the Court was unanimous that a municipality can and will be held liable under section 1983 for an unconstitutional exercise of power by the municipality's legislative body. See id. at 126, 108 S.Ct. at 925-26 (O'Connor, J., joined by Rehnquist, C.J., and White and Scalia, JJ.) ("[O]ne would have to conclude that policy decisions made ... by the Mayor and Aldermen," who are authorized to adopt ordinances relating to personnel administration, "would be attributable to the city itself."); id. at 125, 108 S.Ct. at 925 (actions of "official or body that has the responsibility for making law" can give rise to municipal liability under section 1983); id. at 138, 108 S.Ct. at 932 (Brennan, J., concurring in the judgment, joined by Marshall and Blackmun, JJ.) ("Nor have we ever doubted that a single decision of a city's properly constituted legislative body is a municipal act capable of subjecting the city to liability."); id. at 140, 108 S.Ct. at 933 ("[I]n Owen and Fact Concerts we deemed it fair to hold municipalities liable for the isolated, unconstitutional acts of their legislative bodies ....");[4] id. at 147, 108 S.Ct. at 936 (Stevens, J., dissenting) (presuming that legislative acts can give rise to municipal liability).
 
 
 16
 Our holding today that a municipality does not enjoy immunity with respect to the acts of its legislative body, thus, should come as no surprise. In fact, every other circuit that has considered this issue has either held or presumed that a municipality is not entitled to absolute legislative immunity from suits brought under section 1983. See, e.g., Goldberg v. Town of Rocky Hill, 973 F.2d 70, 72, 74 (2d Cir.1992) (rejecting "out of hand" the claim that a municipality "is entitled to absolute immunity for its legislative acts," and "hold[ing] that there is no immunity defense, either qualified or absolute, available to a municipality sought to be held liable under 42 U.S.C. Sec. 1983"); Aitchison v. Raffiani, 708 F.2d 96, 100 (3d Cir.1983) (citing Reed v. Village of Shorewood, 704 F.2d 943, 953 (7th Cir.1983)) ("[L]iability against the municipality is not precluded simply because the [local legislators] were found immune in their individual capacities."); Reed v. Village of Shorewood, 704 F.2d 943, 953 (7th Cir.1983) (holding that a "municipality's liability for [the official acts of municipal policy makers] extends to acts for which the policy-making officials ... might enjoy absolute immunity because the acts were legislative or judicial in character"); Kuzinich v. County of Santa Clara, 689 F.2d 1345, 1350 (9th Cir.1982) (complete immunity of county legislators does not immunize county); Hernandez v. City of Lafayette, 643 F.2d 1188, 1196 (5th Cir. Unit A May 1981) ("We consider the Supreme Court's decision in Owen and its caveat in Lake Country Estates to be dispositive of the city's argument and hold that the City of Lafayette is not entitled to a legislative immunity from damages under Sec. 1983...."), cert. denied, 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982); Gorman Towers, Inc. v. Bogoslavsky, 626 F.2d 607, 613 n. 7 (8th Cir.1980) (" Owen would seem to provide a remedy for unconstitutional municipal legislation." (emphasis omitted)).
 
 
 17
 In the face of this overwhelming authority, the City of Charleston attempts to justify its claim of absolute legislative immunity by reference to the tradition and policy justifications supporting the legislative immunity for individual legislators. While there is indeed a long tradition of granting individual legislators at all levels of government a broad immunity from suits based upon their legitimate legislative activities,[5] and though there are undoubtedly strong public policy justifications for such immunity,[6] the Supreme Court has instructed that the defenses available to an official in a personal capacity action simply "are unavailable" in a suit against a governmental entity. Kentucky v. Graham, 473 U.S. 159, 167, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985) (citing Owen ); see also Owen, 445 U.S. at 638 n. 18, 100 S.Ct. at 1409 n. 18 (factors supporting an immunity for officers sued in individual capacity "differ[ ] significantly" from factors considered when "only the liability of the municipality itself is at issue").
 
 
 18
 The Court has made clear that neither the tradition nor the public policy considerations supporting a broad legislative immunity for legislators sued in their individual capacity has persuasive force when the liability of the municipality is at issue. The Court foreclosed reliance on the tradition of legislative immunity for individual legislators when it stated in unequivocal terms that "there is no tradition of immunity for municipal corporations." Id. at 638, 100 S.Ct. at 1409.
 
 
 19
 As to the public policy behind granting individual officers an immunity, the Court explained in Owen that the "overriding considerations of public policy," which, on occasion, have led the Court to conclude that an "official be given a measure of protection from personal liability," are "less compelling, if not wholly inapplicable, when the liability of the municipal entity is at issue." Id. at 653, 100 S.Ct. at 1416. The Court in Owen cited two such policy considerations: first, the injustice of holding a public officer personally liable for making discretionary decisions mandated by his public employment, and second, "the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good." Id. at 654, 100 S.Ct. at 1417 (quoting Scheuer v. Rhodes, 416 U.S. 232, 240, 94 S.Ct. 1683, 1688, 40 L.Ed.2d 90 (1974)). The Court dismissed the first concern as simply inapplicable when the municipality's liability is at issue. See id. And, though the second rationale, concerned with the deterrent effect of an adverse judgment, would seem to apply to municipalities as well as to individuals, the Court nonetheless found that this rationale likewise "loses its force when it is the municipality, in contrast to the official, whose liability is at issue." Id. at 655, 100 S.Ct. at 1418. The Court explained that
 
 
 20
 [a]t the heart of this justification for a qualified immunity for the individual official is the concern that the threat of personal monetary liability will introduce an unwarranted and unconscionable consideration into the decisionmaking process, thus paralyzing the governing official's decisiveness and distorting his judgment on matters of public policy. The inhibiting effect is significantly reduced, if not eliminated, however, when the threat of personal liability is removed. First, as an empirical matter, it is questionable whether the hazard of municipal loss will deter a public officer from the conscientious exercise of his duties; city officials routinely make decisions that either require a large expenditure of municipal funds or involve a substantial risk of depleting the public fisc. More important, though, is the realization that consideration of the municipality's liability for constitutional violations is quite properly the concern of its elected or appointed officials. Indeed, a decisionmaker would be derelict in his duties if, at some point, he did not consider whether his decision comports with constitutional mandates and did not weigh the risk that a violation might result in an award of damages from the public treasury.
 
 
 21
 Id. at 655-56, 100 S.Ct. at 1418 (citations and footnotes omitted) (emphases in original); see also id. at 653 n. 37, 100 S.Ct. at 1416 n. 37 (citing Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 405 n. 29, 99 S.Ct. 1171, 1179 n. 29, 59 L.Ed.2d 401 (1979)) ("[T]he justifications for immunizing officials from personal liability have little force when suit is brought against the governmental entity itself.").
 
 
 22
 Indeed, in the Court's view, the very existence of an immunity for individual officials cuts strongly in favor of denying immunity to the municipality the official represents. In Owen, for instance, the Court concluded that, in light of the qualified immunity already afforded to officials sued individually, the only way to "properly allocate[ ]" the costs of constitutional violations among government officials, municipalities, and victims, is to deny an immunity defense to the municipality. Id. at 657, 100 S.Ct. at 1418-19. And in Lake Country Estates, the Court justified its grant of absolute immunity to regional legislators serving on the Tahoe Regional Planning Agency (TRPA), in part on the fact that a plaintiff would still be able to proceed against the regional entity:
 
 
 23
 If the [legislators serving on TRPA] have enacted unconstitutional legislation, there is no reason why relief against TRPA itself should not adequately vindicate petitioners' interests.
 
 
 24
 Lake Country Estates, 440 U.S. at 405 n. 29, 99 S.Ct. at 1179 n. 29 (emphasis added).[7]
 
 
 25
 In sum, though the issue before us today is an important one, it is ultimately easily resolved. The Supreme Court effectively answered the question fifteen years ago in Owen. A unanimous Court in Leatherman recently reaffirmed Owen, and every other circuit to have addressed the issue has read Owen as foreclosing the possibility of legislative immunity for municipalities. In accord with this controlling, and otherwise impressive, body of authority, we hold that a municipality is not entitled to an absolute immunity for the actions of its legislature in suits brought under 42 U.S.C. Sec. 1983.
 
 II.
 
 26
 In the instant case, the appellants' complaint alleged that, in enacting the annual budget for the City of Charleston in 1993, Charleston's Common Council denied appellants a salary increase on the impermissible ground that the appellants had actively supported a candidate in the prior mayoral election other than the one favored by a majority of the members of the Common Council, in violation of the First Amendment. The plaintiffs thus directly challenged the Common Council's execution of a core legislative function. J.A. at 72 (opinion of district court) ("Plaintiffs' complaint squarely attacks a classic legislative function of the Council."); see also Rateree v. Rockett, 852 F.2d 946, 950 (7th Cir.1988) ("Budgetmaking is a quintessential legislative function reflecting the legislators' ordering of policy priorities in the face of limited financial resources." (citation omitted)).[8]
 
 
 27
 The district court dismissed the complaint without addressing the merits of plaintiffs' claim, holding that the City of Charleston, the real party in interest in this case, see Goldsmith v. Mayor and City Council of Baltimore, 987 F.2d 1064, 1066 n. 2 (4th Cir.1993), is absolutely immune from suits challenging the activities of the Common Council of the City of Charleston. The district court reasoned:
 
 
 28
 Plaintiffs' allegation that the Council denied their raises solely because of their political support of Mayor Hall would necessarily require an examination of the Council's motive for its vote. Such an inquiry "runs squarely afoul of the doctrine of legislative immunity." Where a suit would require testimony from legislators regarding their legislative activities, "the doctrine of legislative immunity has full force."
 
 
 29
 J.A. at 73 (citation omitted). Because we hold today that the City of Charleston is not entitled to absolute immunity under section 1983 from suits involving the decisions and enactments of Charleston's Common Council, the judgment of the district court is reversed. To the extent that our opinions in Baker v. Mayor and City Council of Baltimore, 894 F.2d 679, 682 (4th Cir.), cert. denied, 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990), and Schlitz v. Commonwealth of Virginia, 854 F.2d 43, 45-46 (4th Cir.1988),[9] can be read to confer legislative immunity on municipalities from suits brought under section 1983, those decisions are overruled.
 
 
 30
 The judgment of the district court is reversed and the case is remanded for further proceedings.
 
 
 31
 REVERSED AND REMANDED.
 
 
 32
 PHILLIPS, Senior Circuit Judge, specially concurring:
 
 
 33
 I concur in the majority opinion, which I think admirably demonstrates why extant Supreme Court precedents compel the result reached.
 
 
 34
 I write specifically only to state my understanding that the laudatory comments in footnote 1 respecting the dissenting opinion are not intended to imply that were we free to do so, we would accept its policy arguments for granting municipalities absolute immunity to Sec. 1983 claims for monetary relief for their unconstitutional legislative acts. It may be proper at our level to use a dissenting opinion as a vehicle for suggesting re-examination of extant Supreme Court authority on policy grounds, but I would not want to be thought persuaded by those made in the dissent here. With all respect to the elegance and fervor with which its political theories are advanced, I think it greatly overstates the threats to democratic government at the local level that it suggests flow from exposing municipalities to such suits. And, I believe it important to point out that there is not a shred of evidence in the record before us, either in the form of anecdotal or expert opinion testimony or by way of "Brandeis brief," to support the assertion that any such practical threats actually exist and are being experienced in the real world. In the absence of such evidence, I think the more appropriate policy assumption--were any appropriate in the case presented to us--is that there is no such inhibiting effect on local government as the dissent posits. We are not referred to any other lower federal or state court decision which has expressed similar concerns, though municipal exposure to such claims has been a generally recognized legal reality now for years. The "chilling effect" on official conduct that is posited is one that could only be experienced by individual legislators, and they have the protections both of absolute legislative immunity to suit and of testimonial privilege if they prefer not even to participate in litigation against the municipality itself. And, the experience of history which presumably informed the common law's refusal to accord such immunity (as documented in the Supreme Court decisions refusing to accord it as to Sec. 1983 claims) must surely have confirmed that no such inhibiting effect was being generally experienced.
 
 
 35
 ERVIN, C.J., and MURNAGHAN, J., join in this special concurrence.
 
 WIDENER, Circuit Judge, dissenting:
 
 36
 I respectfully dissent.
 
 
 37
 I agree with and concur in Judge Wilkinson's excellent dissenting opinion.
 
 
 38
 In my opinion, the decision of the majority in this case is contrary to the most fundamental notions of our form of representative government. The subordination of the legislative branch of government espoused by the majority in this case will prove to be as fatal to this commonwealth as that Plato warned of.
 
 
 39
 Where there are three orders, then, any plurality of functions or shifting from one order to another is not merely utterly harmful to the community, but one might fairly call it the extreme of wrongdoing. And you will agree that to do the greatest of wrongs to one's own community is injustice.
 
 
 40
 Surely.
 
 
 41
 The Republic of Plato, Oxford University Press 1968-3 reprint, Chapter XII, p. 129.
 
 WILKINSON, Circuit Judge, dissenting:
 
 42
 The practical consequence of the majority's decision is to subject local legislators to federal suit for routine votes on a municipal budget. By doing so, we have consigned to federal court the most basic and important acts of a democracy. This amounts, literally, to local government by lawsuit. Because such a result stretches 42 U.S.C. Sec. 1983 beyond all reasonable bounds and does grave harm to our fundamental democratic notions of political participation and representation, I respectfully dissent.
 
 I.
 
 43
 This controversy involves nothing more than a political dog fight over a municipal budget--the kind that arises in local governing bodies every day. If municipal budget disputes must now regularly be replayed in actions for damages under 42 U.S.C. Sec. 1983, then the federal courtroom will come to replace the county meeting hall and city council chambers as the cornerstone of American politics. With all respect to the majority, the Supreme Court has not sounded this sort of death-knell for democratic governance.[1]
 
 
 44
 The majority's rationale is that this outcome is appropriate because plaintiffs have sued a municipal legislative entity for damages rather than the individual legislators themselves. The majority apparently believes that because legislators remain personally immune from damages for a vote on a municipal budget, their immunity interests are sufficiently vindicated. It is a mistake, however, to equate the sum of the immunity interests in this case with the prospects of personal monetary liability. Much more is at stake.
 
 
 45
 The absence of municipal immunity for a legislator's votes on a municipal budget erodes the viability of the entire local political process. The abrogation of municipal immunity for such votes will subtly transform the nature of political accountability. Pecuniary penalties, albeit against the municipality, will come to substitute for traditional reckonings at the polls. Local legislators will have to explain their votes on legislative appropriations to a court as well as to the electorate. That is not how democracy was meant to function.
 
 
 46
 This case will prove all too typical. The complaint presents a budget dispute involving municipal salary outlays between the council supporters and opponents of Charleston Mayor Kent Strange Hall. Budget fights of this kind invariably produce winners and losers. Under the majority's ruling, the losers of such struggles now have an engraved invitation to proceed to federal court. It will be simple to portray any budgetary cut as plaintiffs have here--as an act of "political retaliation" in violation of the First Amendment. Indeed, a complaint may be expected to characterize any legislative success of an opposing faction in its most pejorative political light. Under Fed.R.Civ.P. 12(b)(6), a federal court must accept those allegations as true. Justice Frankfurter must have had this dispute in mind when he wrote: "[i]n times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies." Tenney v. Brandhove, 341 U.S. 367, 378, 71 S.Ct. 783, 789, 95 L.Ed. 1019 (1951) (emphasis added).
 
 
 47
 The damage done to the political process will be acute. Lawsuits by disgruntled individuals may replace the voice of the electorate as the agent of municipal change and the instrument of municipal policy. This sad development is made worse because it occurs in the context of some 85,000 city and county governments, which were established to provide the purest and most direct form of political participation available to American citizens. "In the township, as well as everywhere else, the people are the source of power; but nowhere do they exercise their power more immediately." 1 Alexis de Tocqueville, Democracy in America 64 (P. Bradley ed. 1945).
 
 
 48
 Lawsuits such as this one also substantially weaken the ability of individual legislators to carry out the will of the voters. Instead of enjoying the freedom to cast votes according to their consciences and the wishes of their constituents, legislators must now look over their shoulders at the possible legal consequences of a vote cast or an argument advanced. Statements made on items in a local budget will now turn up as evidence of unconstitutional "political" motive in federal court. Legislators will have to consider how legislative action will be viewed by the most litigious members of their community. Such consequences are clearly contrary both to the purpose of Sec. 1983 and the ideals of good government. As the Supreme Court has noted, "any restriction on a legislator's freedom undermines the 'public good' by interfering with the rights of the people to representation in the democratic process." Spallone v. United States, 493 U.S. 265, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990). The very purpose of immunity is "to insure that the legislative function may be performed without fear of outside interference." Supreme Court of Virginia v. Consumers Union of the United States, Inc., 446 U.S. 719, 731, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641 (1980).
 
 
 49
 These concerns have been repeatedly acknowledged as the basis of individual legislative immunity. See, e.g., Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 404-405, 99 S.Ct. 1171, 1179, 59 L.Ed.2d 401 (1979); Scheuer v. Rhodes, 416 U.S. 232, 240-41, 94 S.Ct. 1683, 1688-89, 40 L.Ed.2d 90 (1974); Acevedo-Cordero v. Cordero-Santiago, 958 F.2d 20, 22 (1st Cir.1992). As a practical matter, they are no less powerful when the legislative entity itself is sued. A suit for damages against the legislative entity transfers a budget dispute to federal court just as surely as a suit against legislators in their individual capacities. Every discretionary trade-off in a municipal budget decision will now be subject to judicial second-guessing.
 
 
 50
 The complaint in this case seeks damages for past and future lost wages and benefits, embarrassment, humiliation, and reputational injury. It concludes--as is typical--with a demand for trial by jury. And in the absence of any municipal immunity, budget-making by jury trial may become the rule, not the exception. It is easy to see how the multiple motivations of legislators on a budget vote will present a genuine issue of material fact. Juries will thus come to serve as proxies for the larger electorate, and be drawn into the partisan passions of local political life. This concern over the politicization of the courts has been a critical ingredient of legislative immunity from the outset. Tenney, 341 U.S. at 378, 71 S.Ct. at 789. It also should inform the existence of a derivative municipal immunity in the particular context of a budgetary dispute.
 
 
 51
 Another important immunity interest overlooked by the majority is a legislator's need for freedom from the burdens of litigation. The Supreme Court has repeatedly stressed that immunity under Sec. 1983 is "an immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (emphasis in original). See also Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991); Davis v. Scherer, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019-20, 82 L.Ed.2d 139 (1984). This is so because the consequences of Sec. 1983 actions include "the general costs of subjecting officials to the risks of trial--distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." Harlow v. Fitzgerald, 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982).
 
 
 52
 All three of Harlow 's immunity concerns are implicated in this lawsuit. The Harlow burdens are no less significant because the action is brought against the municipal entity; as the only "real" persons involved, legislators still must carry the weight of the impositions and distractions of every case brought. In the case of municipal government, moreover, the consequences of an abrogation of all immunity are especially severe. Local elected officials may not enjoy the recognition of those who hold state or federal office. Many, however, are public-spirited citizens, and especially in smaller communities, they often serve part-time and for nominal pay. In this case, for example, the Council of the City of Charleston meets only twice a month. See City of Charleston, W.Va. Charter and General Ordinances Sec. 21 (Michie 1975). The twenty-six members of the council are paid $2.50 for each meeting they attend, and their yearly salary may not exceed one hundred dollars. Id. at Sec. 86. Subjecting part-time officials to the periodic vicissitudes of litigation will, in Harlow 's words, both inhibit "discretionary action" and deter "able people from public service." Harlow, 457 U.S. at 814, 102 S.Ct. at 2736. Going from council deliberations on Monday night to depositions on Tuesday morning will not encourage citizens to seek local office. The abrogation of immunity may make the sacrifice involved in public service unacceptable, and help ensure that the hassles of public life outweigh the sense of satisfaction to be found in it.
 
 
 53
 The majority's belief that individual immunity is sufficient thus does not capture the true scope of the relevant immunity interests. Legislative immunity was created to protect a range of interests, not simply to provide a shield against personal damage awards. See Tenney, 341 U.S. at 376-77, 71 S.Ct. at 788. Under the majority's rule, litigants will now be able to circumvent these protections by the simple expedient of naming the legislative body in their complaints. The spirit of municipal reform will surely suffer. Local elections often reflect the electorate's desire either for greater public services or for greater property tax relief. If, however, rescission of spending is to be characterized as actionable retribution, and budgetary retrenchment is to be justiciable as a First Amendment claim of political retaliation, then expenditures, once made, will become semi-sacrosanct. All municipal reform is "retaliation" of a sort--reform by definition represents change from the preceding regime which a dissatisfied electorate decided to throw out. The absence of municipal immunity means municipal elections will no longer bring fresh brooms, because council members charged to carry out an electoral mandate will think twice before making any statement or casting any vote that will tie them up indefinitely in court.[2]
 
 II.
 
 54
 Because immunity interests of great importance are at issue in this case, Congress must be specific if it wishes to abrogate them. It is well-established that when Congress seeks to alter the federal-state equilibrium in a fundamental way, its intention to do so must be "unmistakably clear in the language of the statute." Atascadero State Hospital v. Scanlon, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985). The Supreme Court has further held in similar contexts that 42 U.S.C. Sec. 1983 fails to provide such a clear and specific statement and thus cannot by itself alter the balance of rights and immunities between the states and the federal system. In Will v. Michigan Dep't. of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), for example, the Court found that Sec. 1983 "falls far short" of the demands of specificity and so does not provide a cause of action directly against the states. Id. at 65, 109 S.Ct. at 2309. Likewise, in Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the Court held that Sec. 1983 does not allow punitive damages against localities. It found that " 'Congress would have specifically so provided had it wished to abolish the doctrine' " of municipal immunity from punitive damages, yet did not do so in 42 U.S.C. Sec. 1983. Id. at 263-64, 101 S.Ct. at 2758 (quoting Pierson v. Ray, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967)).
 
 
 55
 Language in other cases addressing the subject of municipal liability under Sec. 1983, such as Monell v. New York City Dep't. of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), appears to reject such a requirement of greater specificity. The majority has meticulously canvassed that language, and I respect the conscientious manner in which it has gone about its task. I do not read the cases discussed by the majority, however, to suggest that the very legislative core of local government is subject to sweeping displacement.
 
 
 56
 The question of municipal liability presented in this case represents a problem of an entirely different magnitude than that considered in Monell and its progeny. In Monell, for example, the Supreme Court examined municipal liability for an unconstitutional employment policy of mandatory, unpaid pregnancy leave for female city workers. Id. at 660-61, 98 S.Ct. at 2020-21. It was clearly an attack on an administrative policy of two city agencies, the Department of Social Services and the Board of Education. Monell established that a municipality might be liable for the policies of its executive departments. It did not involve a direct challenge to the vote of a municipal legislature, much less a vote on a local budget, and the city council was not even a named defendant in the case.
 
 
 57
 Likewise, in Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, --- U.S. ----, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), the issue was municipal liability for the actions of police in searching homes for narcotics. Again, the county legislature was not involved and no legislative immunity questions were even implicated. Finally, Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), did involve a suit against a city council, among others. The action there dealt with a due process claim by a city employee who was libelled by a report released by the council when he was discharged from his job. Id. at 627-28, 100 S.Ct. at 1403-04. The Court refused to grant qualified immunity to the council. Id. at 638, 100 S.Ct. at 1409.
 
 
 58
 Just like Monell and Leatherman, however, Owen never contemplated the extension of Sec. 1983 liability to legislative votes on local budgets. In Owen, the Court did reject the idea that Sec. 1983 preserved a distinction between "discretionary" and "ministerial" functions as a basis for immunity. Owen, 445 U.S. at 648-49, 100 S.Ct. at 1414. Notably, however, the discussion of "discretionary" acts brought within the scope of Sec. 1983 municipal liability focused on policy-making decisions by executive bodies. Id. It never went so far as to suggest that fundamental legislative acts were also subject to federal judicial review, and it never touched upon the budgetary process.
 
 
 59
 The fact that it did not is significant. Decisions about the allocation of public resources are the quintessential task undertaken by an elected representative body, whether it is the City of Charleston Common Council or the Congress of the United States. See Rateree v. Rockett, 852 F.2d 946, 950 (7th Cir.1988) (noting budget-making is the "classic legislative function"). Democracy decides nothing if it cannot set priorities for spending limited public funds. Section 1983 actions that challenge votes on budgetary items are simply different from suits contesting the constitutionality of an executive policy or alleging misconduct on the part of municipal employees. Allowing federal courts to recalculate basic decisions on spending and taxation severely disrupts the balance of federalism. Before improvident interference of momentous importance into municipal government affairs is authorized, it is entirely proper to apply the rule of statutory specificity with some modicum of strictness. The specificity requirement, just like the immunity analysis in the preceding section, must be informed by the unprecedented political nature of the present complaint.
 
 
 60
 Section 1983 is not sufficiently specific to do the job the majority would have it do. When Congress passed this law in 1871, it had no idea it would metastasize to this extent. The members of the 42d Congress never dreamed they were subjecting local legislative bodies to monetary liability and litigation over individual items in a budget, and so of course failed to include language that would override the presumption against upsetting the federal-state balance. To the contrary, as Owen recognized, Sec. 1983 preserved "tradition[s] of immunity ... so firmly rooted in the common law and ... supported by such strong policy reasons that 'Congress would have specifically so provided had it wished to abolish [such] doctrine[s].' " Owen, 445 U.S. at 637, 100 S.Ct. at 1408 (quoting Pierson, 386 U.S. at 555, 87 S.Ct. at 1218). The language of Sec. 1983, which speaks in only the most general terms of "the deprivation" of federal "rights, privileges, or immunities," does not include an intention to displace local authority over local budgets. If Congress had wished to station the federal judiciary at the vortex of state and local politics, it would have said so. In fact, the judiciary's hand is considerably strengthened if the statutory language makes such a congressional intention clear. "The jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation...." American Fire & Cas. Co. v. Finn, 341 U.S. 6, 17, 71 S.Ct. 534, 542, 95 L.Ed. 702 (1951). The very generality of Sec. 1983, however, ensures that the impending judicial involvement in municipal budget disputes will be perceived as self-propelled.
 
 III.
 
 61
 An additional difficulty with the majority's position is the gap that it creates in the overall structure of defenses to Sec. 1983 actions. In striking a balance between vindication of individual rights and limitation of the social costs of litigation, the Supreme Court has always been careful to provide governmental defendants under Sec. 1983 with at least some defense to liability. See Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Thus, individual officials always possess a defense of immunity, whether absolute or qualified. Id. at 638-39, 107 S.Ct. at 3038. Municipalities and municipal bodies, on the other hand, can ordinarily rely on a "custom or policy" defense, which requires proof that the municipality actually "caused" the alleged violation through the adoption of an official policy by a "final decision-maker." St. Louis v. Praprotnik, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). As a number of commentators have noted, the "custom or policy" defense for municipalities is in many ways the de facto equivalent of an immunity defense, given the difficulty of establishing the requisite proofs. See, e.g., Peter H. Schuck, Municipal Liability Under Sec. 1983: Some Lessons From Tort Law and Organizational Theory, 77 Geo.L.J. 1753 (1989); Susanah M. Mead, 42 U.S.C. Sec. 1983 Municipal Liability: The Monell Sketch Becomes a Distorted Picture, 65 N.C.L.Rev. 517, 548 (1987).
 
 
 62
 Thus, a network of defenses covers nearly the entire spectrum of Sec. 1983 claims. The single circumstance where there is no immunity of any sort is the one we are faced with here--a suit for damages against the local legislature itself. Because the legislature is a public body, not an individual, it possesses no absolute or qualified immunity defense of its own. See Leatherman, --- U.S. at ----, 113 S.Ct. at 1162. Moreover, because the legislature is nearly always the "final decisionmaker" in the locality, it cannot avail itself of any meaningful custom or policy defense. See Pembaur v. Cincinnati, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298-99, 89 L.Ed.2d 452 (1986). I am not suggesting, of course, that the city council lacks a Pembaur "custom or policy" defense for any technical or formal reason of pleading. Rather, the point is that as a practical matter, the Pembaur defense is of no value to a city council because it is automatically a final decision-maker. Thus, the toughest hurdle of the defense is easily bypassed in any challenge to a legislative budget vote. In contrast, courts have crafted a much stronger "custom or policy" defense for municipal executive bodies by requiring strict proof that the action complained of actually originated from a true "final decision-maker." See Praprotnik, 485 U.S. at 127, 108 S.Ct. at 926. In sum, a legislative defendant which should by all rights enjoy the greatest protection from Sec. 1983 liability is left in the most defenseless position of all.
 
 
 63
 A testimonial privilege for individual legislators, to which the majority alludes, see majority opinion, note 8, is no answer to this problem. For one thing, the source and scope of such a privilege has not been explained. For another, the practical value of such a privilege is virtually nil. In fact, it makes the dilemma of municipal liability for legislative acts even worse. The losing legislative faction in a budget dispute will readily waive the privilege and testify in court. At that point, the value of any testimonial privilege to the prevailing side becomes as tenuous as the value of, say, the Fifth Amendment privilege against self-incrimination after the prosecution has presented its case-in-chief. Any legislator invoking the privilege will be the object of suspicion in the courtroom, and the municipality will be left in the untenable position of trying to stave off liability in the face of one-sided evidence.
 
 
 64
 The end result is that strict liability for this narrow class of Sec. 1983 defendants, which serves to "convert[ ] municipal governance into a hazardous slalom through constitutional obstacles that often are unknown and unknowable." Owen, 445 U.S. at 665, 100 S.Ct. at 1423 (Powell, J., dissenting). Together with the perception of municipalities as deep pockets, this gap in Sec. 1983 defenses generates a perverse incentive to sue local councils, thereby ensuring these lawsuits will be targeted where they can do the most harm to representative government.
 
 
 65
 The simple solution to this problem is to extend the well-established immunity of individual legislators to cover the legislative body whenever a cause of action "would perforce require testimony of the legislators involved regarding their motives" in a legislative vote. Hollyday v. Rainey, 964 F.2d 1441, 1443 (4th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 636, 121 L.Ed.2d 567 (1992). We have recognized the need to extend legislative privileges to limit the burdens on individual legislators in other kinds of suits against municipalities. Baker v. Mayor and City Council of Baltimore, 894 F.2d 679, 682 (4th Cir.), cert. denied, 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990) (ADEA suit); Schlitz v. Virginia, 854 F.2d 43, 45 (4th Cir.1988) (same). The need for such protections is no less compelling in the context of 42 U.S.C. Sec. 1983.
 
 IV.
 
 66
 The district court's opinion in this case was short and to the point. It stated that "plaintiffs' case squarely attacks a classic legislative function of the Council, its vote on the City budget." The court also noted that resolution of the dispute "would necessarily require an examination of the Council's motive for its vote." Finally, it quoted the Seventh Circuit's holding that a budget vote is not rendered an "administrative" employment decision merely because it impacts city employees:
 
 
 67
 Almost all budget decisions have an effect on employment by either creating or eliminating positions or by raising or lowering salaries. This reality, however, does not transform a uniquely legislative function into an administrative one.... Employment decisions are not administrative when accomplished through traditional legislative functions. They are not "employment decisions" at all but instead, legislative, public policy choices that necessarily impact on the employment policies of the governing body. The political decision making inevitably involved in exercising budgetary restraint strikes at the heart of the legislative process and is protected legislative conduct.
 
 
 68
 Rateree, 852 F.2d at 950-51.
 
 
 69
 I would affirm that judgment. Providing immunity here would not result in any absence of remedies for those opposed to the actions of local legislatures. See Harlow, 457 U.S. at 814, 102 S.Ct. at 2736 (explaining that one basis for rejecting immunity is to avoid cutting off only available avenue for the rectification of constitutional injuries). The correctives for abuse of power in this context are legion. First and foremost, any local legislature that oversteps its bounds must answer to the electorate itself. See Tenney, 341 U.S. at 378, 71 S.Ct. at 789 ("Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses."). See also The Federalist No. 57, at 385 (James Madison) (B. Wright, ed. 1961) (arguing that greatest check on the legislature is the vigilant "spirit which actuates the people of America"). The democratic process relies on the voters, not the courts, as the first line of defense against legislative excess.
 
 
 70
 Legislatures themselves possess effective internal mechanisms for countering misbehavior in the give-and-take of public debate and deliberation. Also, legislative action in a multi-member body requires coalition-building among individual legislators, which acts as a further check on arbitrary or extreme conduct. See Clayton P. Gillette, Plebiscites, Participation, and Collective Action in Local Government, 86 Mich.L.Rev. 930, 943-44 (1988). Many local legislatures have internal disciplinary powers as well. In this case, for example, members of the Common Council may be removed from the legislature for "official misconduct" by either a two-thirds vote of the council or by the circuit court of Kanawha County. City of Charleston Charter and General Ordinances Sec. 19. Public scrutiny through the press also exposes and deters legislative action that crosses permissible lines.
 
 
 71
 Finally, state laws, both civil and criminal, provide additional means by which a wayward local legislature can be held accountable. See Long v. City of Weirton, 158 W.Va. 741, 214 S.E.2d 832, 859 (1975) (allowing state law suits against municipalities in West Virginia); City of Charleston Charter and General Ordinances Sec. 32 (providing criminal sanctions for corruption by council members). See also, e.g., N.C.Gen.Stat. Sec. 160A-485 (1976); S.C.Code Secs. 5-7-70, 15-77-230 (1979); Virginia Electric & Power Co. v. Hampton Redevelopment & Housing Authority, 217 Va. 30, 225 S.E.2d 364, 368 (1976). Indeed, the majority fails to acknowledge that municipalities are subdivisions of the states and are themselves creatures of state law. See W.Va.Code Sec. 8-1-1 et seq. (1990) (providing for creation and regulation of West Virginia municipalities). The primary responsibility for legal regulation of localities has, under our system of federalism, always fallen to the states. Federalism is no mere "political theory," (see concurrence of Phillips, J.) but a structural premise of our Constitution. So, for that matter, is democracy. The idea that local legislatures will run amok if budget struggles are not the subject of Sec. 1983 actions in damages runs counter to the realities of checks and balances in our democratic system.
 
 V.
 
 72
 Many disputes must be resolved by litigation, but this is not one of them. In the end, litigation such as this robs local politics of any pretense to finality. The abrogation of immunity in the context of a municipal budget battle further signals the demise of the political question doctrine, upon which courts have long depended to distance themselves from partisan affairs. The rule of law was not meant to be synonymous with the transfer of purely political business to our courts. There is no more political a business than legislative appropriations. Abraham Lincoln never spoke of government "of the judiciary, by the judiciary, and for the judiciary." He knew from sad experience that judicial involvement carried its own special dangers of abuse, and he understood that true democracy reserved to the people the right to determine their own destiny.
 
 
 73
 DONALD RUSSELL and WIDENER, JJ., join in this dissent.
 
 
 
 [1]
 Our dissenting colleagues do not challenge our reading of this controlling caselaw. They ground their dissent instead exclusively on what they perceive to be the unacceptable policy implications of our decision. Ours, however, is not to craft a wise or effective policy, but rather, only to interpret section 1983 consistently with the Supreme Court's interpretation of that statute. In performing this task, we must assume that, to the extent they are relevant, the Court considered the forceful policy arguments advanced by the dissent before making the categorical statements that it did in Monell, Owen, Lake Country Estates, and Leatherman
 
 
 [2]
 The City Council's involvement in the unconstitutional deprivation in Owen was extensive:
 On the evening of April 17, 1972, the City Council held its regularly scheduled meeting. After completion of the planned agenda, Councilman Roberts read a statement he had prepared on the investigation. Among other allegations, Roberts charged that petitioner had misappropriated Police Department property for his own use, that narcotics and money had "mysteriously disappeared" from his office, that traffic tickets had been manipulated, that high ranking police officials had made "inappropriate" requests affecting the police court, and that "things have occurred causing the unusual release of felons." At the close of his statement, Roberts moved that the investigative reports be released to the news media and turned over to the prosecutor for presentation to the grand jury, and that the City Manager "take all direct and appropriate action" against those persons "involved in illegal, wrongful, or gross inefficient activities brought out in the investigative reports." After some discussion, the City Council passed Roberts' motion with no dissents and one abstention.
 Owen, 445 U.S. at 627-29, 100 S.Ct. at 1403-04 (footnotes omitted) (emphasis added).
 
 
 [3]
 Actions virtually identical to those of the City Council in Owen were held to be legislative in nature in Tenney v. Brandhove, 341 U.S. 367, 377-78, 71 S.Ct. 783, 788-89, 95 L.Ed. 1019 (1951). In Tenney, the plaintiff charged a committee of the California Senate with violating his constitutional rights by holding a hearing in which the committee impugned plaintiff's reputation and at which the committee chairman "read into the record a statement concerning an alleged criminal record of [plaintiff's], a newspaper article denying the truth of [plaintiff's] charges, and a denial by the Committee's counsel--who was absent--that [plaintiff's] charges were true." Id. at 371, 71 S.Ct. at 785. The Court in Tenney granted the individual legislators absolute immunity from suit because these actions were within "the sphere of legitimate legislative activity." Id. at 376, 71 S.Ct. at 788; see also Hernandez v. City of Lafayette, 643 F.2d 1188, 1196 (5th Cir. Unit A May 1981) ("[T]he constitutional violation about which the plaintiff in Owen could legally complain was caused by the members of the city council while performing a legitimate legislative function."), cert. denied, 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982). On similar facts in Owen, the municipality was not afforded any immunity
 
 
 [4]
 In City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the Court considered a section 1983 claim against a municipality that was premised on the unconstitutional conduct of the local legislature. The plaintiffs in Fact Concerts challenged the Newport City Council's decision, rendered through a vote of the Council, to cancel a city license issued to a concert promoter unless the promoter removed the band Blood, Sweat and Tears from the concert program. See id. at 250-52, 101 S.Ct. at 2751-52 (plaintiff charged city and City Council with content-based censorship based upon the Council's "vote[ ] to cancel the license for both days unless Blood, Sweat and Tears were removed from the program")
 
 
 [5]
 The protections afforded federal legislators are found in the Constitution itself. See U.S. Const. art. I, Sec. 6, cl. 1 ("The Senators and Representatives ... for any Speech or Debate in either House ... shall not be questioned in any other Place."); Gravel v. United States, 408 U.S. 606, 615, 92 S.Ct. 2614, 2622, 33 L.Ed.2d 583 (1972) (finding "incontrovertible" the conclusion that the Speech or Debate Clause "at the very least protects [Congressmen] from criminal or civil liability and from questioning elsewhere than in the [Congress]" for matters related to the legislative process). The majority of states have adopted similar constitutional provisions granting state legislators absolute immunity from suits based on actions and statements made during the legislative process. See Tenney v. Brandhove, 341 U.S. 367, 375, 71 S.Ct. 783, 787, 95 L.Ed. 1019 (1951)
 Building on this tradition, the Supreme Court has also recognized an absolute immunity from section 1983 liability for state and regional legislators, who are not otherwise protected by the Speech or Debate Clause and whose state immunity would not protect them from suits brought under section 1983. See id. at 376, 71 S.Ct. at 788 (holding that state legislators are entitled to immunity from civil liability under section 1983 for actions and statements made "in the sphere of legitimate legislative activity"); Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 405, 99 S.Ct. 1171, 1179, 59 L.Ed.2d 401 (1979) (holding that legislators serving on regional, multi-state entity are entitled to absolute immunity on reasoning of Tenney ).
 And, though the Supreme Court has expressly reserved the issue, see id. at 404 n. 26, 99 S.Ct. at 1178 n. 26, most circuits, including this one, have relied on Tenney and Lake Country to hold that local legislators, sued in their individual capacity, are entitled to absolute immunity from section 1983 suits relating to their legitimate legislative activities. See Bruce v. Riddle, 631 F.2d 272, 279 (4th Cir.1980) ("[I]f legislators of any political subdivision of a state function in a legislative capacity, they are absolutely immune from being sued under the provisions of Sec. 1983."); see also Goldberg, 973 F.2d at 72 (collecting cases).
 
 
 [6]
 As the Court observed in Tenney,
 Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence, but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.
 Tenney, 341 U.S. at 377, 71 S.Ct. at 788; see also Collinson v. Gott, 895 F.2d 994, 1007 (4th Cir.1990) (Wilkinson, J., concurring in the judgment) ("[F]ederal trials may yet degenerate into partisan affairs if litigation provides the political opponents of presiding officers with another forum to score points."); id. at 1008 ("The flow of information through th[e] [legislative] process could be severely jeopardized if every public meeting carried with it the threat of civil liability....").
 
 
 [7]
 Similarly, in granting absolute immunity to state legislators in Tenney, the Court was careful to "note[ ] that this is a case in which the defendants are members of a legislature. Legislative privilege in such a case deserves greater respect than where ... the legislature seeks the affirmative aid of the courts to assert a privilege." Tenney, 341 U.S. at 378, 71 S.Ct. at 789; see also id. at 379, 71 S.Ct. at 789-90 (Black, J., concurring) ("It is not held that the validity of legislative action is coextensive with the personal immunity of the legislators."); id. ("The Court holds that the Civil Rights statutes were not intended to make legislators personally liable for damages to a witness injured by a committee exercising legislative power." (emphasis added))
 
 
 [8]
 Because the Common Council's decision to deny the salary increases was legislative, we decline the appellees' invitation to deny the City's claim of legislative immunity on the ground that the Council's action was administrative in nature. See Roberson v. Mullins, 29 F.3d 132, 135 (4th Cir.1994)
 
 
 [9]
 Under Baker and Schlitz, Charleston's council members may be privileged from testifying in federal district court as to their motives in enacting legislation. Because appellants do not challenge this testimonial privilege, except to the extent that such a privilege could be interpreted to afford municipalities immunity from liability under section 1983, we do not address herein the vitality of this privilege in the wake of Owen and today's holding
 
 
 [1]
 My good colleagues in the majority suggest that their approach is governed by precedent, while the dissenting opinion is somehow driven by policy. See majority opinion note 1. In this regard, the majority summons to its aid extended quotations, but those quotations simply do not address the situation at hand. See dissenting opinion Secs. II and III, infra. Specifically, the precedent relied upon by the majority does not contain a single reference to the propriety of turning routine votes on a municipal budget into a Sec. 1983 damages dispute. Indeed, the majority does not contend otherwise, but only states that "we must assume" that the Supreme Court has considered and disposed of this question. I think it legitimate that there be at least a pause before the most essential function of local government is swept away by "assumption." The majority has decided a legal question of first impression, and has taken a significant practical leap. Surely it will seem so to innumerable elected office-holders, who suddenly discover that their votes on a budget are subject to judicial review, and that the legislative vestiges of local government are now justiciable as a matter of nothing more than ipse dixit
 
 
 [2]
 My brother Phillips contends that no such chilling effect is present because no Brandeis brief has proclaimed its existence. The failure of officials to act because of fear of Sec. 1983 litigation, however, is not a matter that is apt to be openly expressed or assiduously documented. The elaborate structure of immunities for Sec. 1983 suits is testament enough that some courts, including the Supreme Court, believe this type of litigation chills, even if the fact has thus far eluded my concurring brother